UNITED STATES of America,
Plaintiff-Appellee,

v.

John K. BRIGGS et al., Defendants,

Robert Wayne Beverly and John C.
Chambers, Defendants-Appellants.

No. 73–2027.

United States Court of Appeals,
Fifth Circuit.

June 13, 1975.

James Reif, Center for Constitutional Rights, New York City, for defendants-appellants.

William H. Stafford, Jr., U. S. Atty., Pensacola, Fla., Richard S. Stolker, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

Appellants were named as "unindicted conspirators" in an indictment by a federal grand jury charging a highly publicized conspiracy. In this case they challenge the power of the grand jury to charge them with criminal conduct in this manner without indicting them. We conclude that the grand jury exceeded its power and authority and that its action was a denial of due process to appellants.

## I. The facts.

Following political demonstrations and disruptions at the Republican Party National Convention at Miami, Florida, on August 21–24, 1972, a federal grand jury sitting in the Northern District of Flori-da undertook an investigation into the disturbances and their causes. The grand jury's probe led it to believe in the existence of a plot to achieve riot and the widespread use of various implements of violence. On October 18, 1972, the grand jury issued a five-count indictment. We set out in the margin the pertinent parts of Count One,[1] which charged a conspiracy to violate various federal statutes in violation of 18 U.S.C. § 371, a felony offense. The statutes were:

—18 U.S.C. § 2101: organizing, promoting, encouraging and participating in a riot.

—18 U.S.C. § 844(i): malicious destruction of property by means of explosives.

—18 U.S.C. § 844(h): use of explosives to commit federal felonies.

---

1. That on or about April 1, 1972, continuing to and including the date of the return of this indictment, in the Northern District of Florida and elsewhere,

JOHN K. BRIGGS,
SCOTT CAMIL,
JOHN W. KNIFFIN,
WILLIAM J. PATTERSON,
PETER P. MAHONEY,
ALTON C. FOSS, and
DONALD P. PERDUE

defendants herein, and Charles Becker, Robert Wayne Beverly, John V. Chambers and others not known to the grand jury, co-conspirators not named as defendants herein, did wilfully, knowingly, and unlawfully conspire, combine, confederate, and agree together, each with the other, and with divers other persons, some known and others unknown to the grand jury, to commit offenses against the United States, to wit, to travel in interstate commerce from outside the State of Florida to Miami Beach, Florida, on or about August 21, 1972, to organize, promote, encourage, and participate in a riot, in violation of Title 18, United States Code, Section 2101; to maliciously damage and destroy by means of explosives buildings, vehicles, and other personal and real property used in interstate commerce, in violation of Title 18, United States Code, Section 844(i); to use explosives to commit felonies prosecutable in courts of the United States, in violation of Title 18, United States Code, Section 844(h); to possess firearms, that is, destructive devices, which had not been registered in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5861(d); and to possess firearms, that is, destructive devices, which were made without the payment of the making tax, in violation of Title 26, United States Code, Section 5861(c).

It was the part of the said conspiracy that the defendants and the unindicted co-conspirators would organize numerous "fire teams" to attack with automatic weapons fire and incendiary devices police stations, police cars, and stores in Miami Beach, Florida, on various dates between August 21 and 24, 1972; that the defendants and the unindicted co-conspirators would fire lead weights, "fried" marbles, ball bearings, "cherry" bombs, and smoke bombs at police in Miami Beach, Florida, on various dates between August 21 and 24, 1972, by means of wrist rocket slingshots and cross bows; that the defendants and the unindicted co-conspirators would disrupt communications systems in Miami Breach, Florida, on various dates between August 21 and 24, 1972.

OVERT ACTS

In furtherance of the said conspiracy and to accomplish its purposes and objectives, the defendants and unindicted co-conspirators committed the following overt acts:

\* \* \* \* \* \*

7. On or about May 27, 1972, Scott Camil, John W. Kniffin, William J. Patterson, Peter P. Mahoney, Charles Becker, Robert Wayne Beverly, and others met at 734 East University, Gainesville, Florida.

\* \* \* \* \* \*

—26 U.S.C. § 5861(d): possession of unregistered firearms.

—26 U.S.C. § 5861(c): possession of non-tax paid firearms.

The alleged conspirators included ten named persons plus others not named. Of the ten persons named, seven were made defendants and three were not. The latter three, although accused of participation in the criminal conspiracy, were denominated in the indictment as "unindicted co-conspirators." Of the persons not named some were alleged to be known and others unknown.

Prior to the trial of the seven named defendants, two of the three named but unindicted persons, Robert Wayne Beverly and John Victor Chambers, filed a petition in the United States District Court for the Northern District of Florida, seeking entry of an order expunging the references to them in Count One of the indictment. The United States Attorney appeared and contested the application. The named defendants did not object to expunction of references to Beverly and Chambers. The District Judge denied the petition without opinion or statement of reasons.[2] The petitioners appealed. Pending appeal and following a month-long trial before a jury,[3] the indicted conspirators were acquitted.

The issue for decision appears to be of first impression at the appellate level.[4]

## II. Justiciability, standing and mootness.

We hold that there is a case or controversy, that the appellants have standing, and that the acquittal of the persons named as defendants does not moot the case. The government's position to the contrary on each of these points is founded upon its argument that since the appellants were not indicted, and particularly since those named as defendants were acquitted, the formal branding of appellants as alleged felons and as participants in a distasteful conspiracy is a mere chimera, neither substantial nor injurious. This is at least disingenuous.

Beverly and Chambers complain of injury to their good names and reputations and impairment of their ability to obtain employment. The courts have recognized in many contexts that these are substantial and legally cognizable interests entitled to constitutional protection against official governmental action that debases them. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), concerned validity of a Wisconsin statute providing for posting of public notices labelling persons as excessive drinkers. The Court characterized "a person's good name, reputation, honor, or integrity" as protected interests and said:

It would be naive not to recognize that such "posting" or characterization of

---

**2.** In colloquy with counsel, however, the District Judge stated that he based his denial upon the objection of the government that since the petitioners were not named as defendants they lacked standing to object to the contents of the indictment.

"THE COURT: You are standing or falling on the fact these people, not being parties sued, can't be heard on the application?

MR. CARROUTH [U.S. Attorney]: That is correct, Your Honor.

THE COURT: All right, I am afraid I must agree with that and I am going to deny that application. I realize there is some merit in what you say but I think it must be denied and I am going to deny it on that ground."

**3.** On Count One and four substantive counts.

**4.** At the trial level, *see* Application of American Society for Testing and Materials, 231

F.Supp. 686 (E.D.Pa., 1964), and Application of Turner and Newall, Ltd., 231 F.Supp. 728 (E.D. Pa., 1964), both discussed *infra*, in parts II and IV. The Third Circuit tangentially referred to the issue in In re Egan, 450 F.2d 199 (CA3, 1971), aff'd sub nom. United States v. Egan, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). In reviewing an adjudication of contempt against Sister Joques Egan, who had refused to testify before a grand jury, the court after noting that she had been named as an unindicted conspirator [in United States. v. Ahmed, No. 14950 (M.D.Pa.)], stated:

"It has been suggested that this may be a significant fact since it leaves Sister Egan subject to a charge in a public document with no right to disprove it, or to participate at the trial."

450 F.2d at 200, n. 2.

an individual will expose him to public embarrassment and ridicule.

*Id.* at 435–36, 91 S.Ct. at 509, 27 L.Ed.2d at 518. The Court observed that to some persons posting under the statute might be merely the mark of an illness, but to others it was "a stigma, an official branding of a person," the imposition of a "degrading" and "unsavory" label. *Id.* at 437, 91 S.Ct. at 510, 27 L.Ed.2d at 519.

In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court recognized that a teacher's "interest in liberty" would be adversely affected if the state, in declining to rehire him, made "any charge against him that might seriously damage his standing and associations in his community." [5]

The public ignominy of being accused of crime is one of the factors underlying the Sixth Amendment right to speedy trial. Klopfer v. North Carolina, 386 U.S. 213, 221, 87 S.Ct. 988, 18 L.Ed.2d 1, 7 (1967). In Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), the interest of appellant that was recognized was that he not be publicly branded as a criminal without a trial through the means of a state-created "Commission of Inquiry."

In Application of American Society for Testing and Materials, 231 F.Supp. 686 (E.D.Pa.1964), the court acted to protect the name and reputation of a named but unindicted conspirator in an antitrust action. The American Society (ASTM) was a nonprofit corporation comprised of persons drawn from major industries of the United States, having as one of its purposes the standardization of specifications and methods of testing various materials, and headed by persons described by the court as "dedicated, selfless scientists." In the same series of litigation the court acted to also protect the name of a business concern that was another named but indicted conspirator. Application of Turner and Newall, Ltd., 231 F.Supp. 728 (E.D.Pa., 1964).[6]

The legally protected right in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), was that of a charitable organization "to carry on its work, free from defamatory statements of the kind discussed." 341 U.S. at 140–141, 71 S.Ct. at 632, 95 L.Ed. at 837 (designation of an organization as communist by the Attorney General of the United States).

■ Appellants complain also of injury to their economic interests. One's right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment. Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377, 1388 (1959) (denial of security clearance for access to classified information resulting in loss of job and inability to find other employment); with respect to public employment, *cf.* Board of Regents v. Roth, *supra,* Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). It would be unrealistic to deny that an accusation, even if unfounded, that one has committed a serious felony may impinge upon employment opportunities.

■ In the present case the District Judge recognized the injury to appellants' interests. Addressing government counsel at the hearing on appellants' application he said:

There are two points involved. One is their right to be heard and beyond that is the basic right they assert. What these people, what these cases are really saying is just this. How would you or how would I or how would any around this room like to have the Grand Jury come in and name us as a co-conspirator and yet

---

5. The general body of law recognizing a right to redress for defamation has the same underpinnings. Restatement (Second) of Torts § 559 (Tent. Draft No. 20, 1974).

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

6. Over government objections the court granted relief to both applicants. These cases are discussed more fully in part IV, *infra.*

not indict us and give us no chance to be heard, and these cases do get into pretty serious areas in that respect. Beverly and Chambers were not subjected to the burdens of trial and the risk of conviction, as were the persons named as defendants. They do not, however, seek to protect their reputations against these hazards but rather against the opprobrium resulting from being publicly and officially charged by an investigatory body of high dignity with having committed serious crimes.[7] In addition to being serious, the offenses charged were given wide notoriety and were peculiarly offensive. An alleged conspiracy to disrupt the national nominating convention of a major political party strikes at the core of democratic institutions.

The government defies common sense with its theory that one's interests are not adversely affected to any extent by being publicly branded as a felon so long as he is not named as a defendant for trial. We reject as frivolous the contention that if appellants have suffered injury it is at the hands of only the news media to whom they should repair for relief. Coupled with these two arguments by the government is a third, which can be described as "innocence by association," that is, that the judgment of acquittal of the seven named defendants both exonerated the appellants and repaired any injury they may have suffered. Certainly the judgment did not in a legal sense exonerate Beverly and Chambers, who were not on trial and had no access to the forum. It does not bar later indictments against them. It is mere speculation to say that in a practical sense the vindication of the named defendants rubs off on the appellants and ameliorates their injury. The acquittal of a named defendant is not wholly curative of the reputational injury suffered by having been charged and tried, but our system permits the residual injury in its pursuit of overall societal interests. The appellants are not even the beneficiaries of such a partial cure.

So far as we, the parties, and the public at large can discern, the jury may have considered Beverly and Chambers—not present to defend themselves—as the real culprits. The indictment remains in the official records of the Northern District of Florida and presumably of the Department of Justice. The currency given to it—at least that in written form—remains unretracted in libraries and depositories.

What we have said leads to several conclusions. There is an actual case or controversy. It is narrow, sharply drawn, and concrete. On one side are the persons who complain of injury to them by a single document, and on the other side is the sovereign, defending the power of the grand jury to do what was done. The appellants fulfill the standing requirements established by the Supreme Court in Ass'n of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See Florida v. Weinberger, 492 F.2d 488 (CA5, 1974).

The issue is not political. The subject matter has not been expressly reserved to the executive or legislative branches. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947, 959 (1968); Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407, 415–416 (1973). The court will be able to resolve the issue without doing violence to the doctrine of separation of powers, and the relief sought is within the power and competence of the judicial branch. See Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 69, 7 L.Ed.2d 663, 685–86 (1962).

The dispute has not been resolved by subsequent developments, and an opinion will not be merely advisory. See California v. San Pablo & Tulare Ry. Co., 149 U.S. 308, 37 L.Ed. 747, 748–49 (1893); C. Wright, Law of Federal Courts, § 12, at 35–36 (2d Ed., 1970).

---

7. In tort law, slanderous publication imputing to another a criminal offense subjects the defamer to liability without proof of special harm. Restatement (Second) of Torts, § 570 (Tent. Draft No. 20, 1974).

Both the dispute and the injury to appellants are real, direct and continuing.[8]

From these threshold issues we turn to the merits.

### III. The merits.

The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. United States v. Calandra, 414 U.S. 338, 342–343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561, 568 (1974). In its investigative-accusative function the grand jury determines if there is probable cause to believe a crime has been committed, and issues indictments accordingly. *Id.;* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

In its function of shielding and protecting the citizen against arbitrary and oppressive governmental action the grand jury:

> Historically . . . has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580 (1962) (footnote omitted). The Supreme Court again recognized the shielding function of the grand jury in Jenkins v. McKeithen, *supra:*

> [T]he grand jury is designed to interpose an independent body of citizens between the accused and the prosecuting attorney and the court.

395 U.S. at 430, 89 S.Ct. at 1853, 23 L.Ed.2d at 422. The judges of this court recognized the grand jury's dual function as investigator-accuser and as protector in the four separate opinions issued in United States v. Cox, 342 F.2d 167 (CA5), cert. denied sub nom. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). *See* 342 F.2d at 170, 174–75, 183, 189–90.

In this country the grand jury was considered so essential to liberty that the Fifth Amendment precluded federal prosecution for serious crime without a presentment or indictment by a grand jury. United States v. Calandra, *supra,* 414 U.S. at 343, 94 S.Ct. at 617, 38 L.Ed.2d at 568.

Neither the Constitution, federal statutes, nor the Federal Rules of Criminal Procedure define the functions or powers of the grand jury.[9] Its powers have been delineated by the courts. In Re Grand Jury Proceedings, 479 F.2d 458, 460 n. 2 (CA5, 1972) (the "El Paso Case").

■ An indictment is returned by a grand jury pursuant to its investigatory-accusatory function. It is a specific accusation of crime, having a threefold purpose: notice to the defendant, pleading in litigation, and the basis for the determination of former acquittal or conviction. United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588 (1876); United States v. Seeger, 303 F.2d 478 (CA2, 1962); 1 Orfield, Criminal Proce-

---

**8.** In Application of Turner and Newall, Ltd., 231 F.Supp. 728 (E.D.Pa.1964), the court granted post-trial relief by entering a memorandum and findings stating that there was not sufficient evidence to support the indictment's charge against the applicant. To a contention of mootness, made after the named defendants on trial were acquitted, the court responded:

> "This case involves the imputation of illegality, up to June 1, 1962, and inferentially there-

after, to the applicant in a document of record, which is not a moot question as far as the applicant is concerned. The Memorandum and finding [entered post-trial by the court] . . . are based upon a specific record in a real and substantial controversy."

**9.** *See* 28 U.S.C. §§ 1861–65, 1867, 1871; F.R. Crim.P. Rule 6.

dure Under the Federal Rules § 7.80 at 665–666. None of these functions encompasses public accusations directed at persons not named as defendants.

We have found no reported opinion or scholarly commentary, and the government suggests none, contending that a federal grand jury is empowered to accuse a named private person of crime by means of an indictment which does not make him a defendant. The government, unable to point to supporting authority, states that the practice has long been in effect. In Application of United Electrical, Radio & Machine Workers, 111 F.Supp. 858 (S.D.N.Y., 1953), a similar argument was advanced in an effort to give validity to a grand jury report accusing private persons of crime. The court responded, 111 F.Supp. at 869:

> That [grand jury reports] have been received without challenge does not import judicial sanction or authority in the Grand Jury to issue them. . .
> The most that can be said is that they were not challenged and were permitted to go by default.

Hammond v. Brown, 323 F.Supp. 326 at 345–46 (N.D.Ohio), aff'd 450 F.2d 480 (CA6, 1971) (challenging the "Kent State" prosecutions), also rejected custom as a basis on which to sanction grand jury reports criticizing or defaming private persons without indictment.

The offending document in this case is an indictment that accuses appellants but does not make them defendants for trial. No claim is made, indeed none can be made, that it was or purported to be a grand jury "report." We refer, however, to the body of law concerning reports by federal grand juries because it is consistent with what we here conclude with respect to indictments.

Common law grand juries at times issued nonindicting reports. Usually these were directed at undesirable community conditions or the conduct of public affairs, and did not purport to charge a criminal offense and to bring an offender to justice but were for the purpose of arousing public and legislative indignation. See the authorities collected in Judge Ainsworth's opinion in the El Paso case, supra, 479 F.2d at 460 n. 2.

The authorities are divided upon whether a federal grand jury has authority to issue a report of any kind. Authorities pro and con are reviewed in In re Report and Recommendations of June 5, 1972 Grand Jury, 370 F.Supp. 1219 (D.D.C., 1974) (concerning delivery of "Watergate" grand jury report to House Committee on the Judiciary.[10] This court pretermitted the issue in the El Paso case, 479 F.2d at 460, and it is not presented for decision in this case. Rather, as a tool in analyzing the specific issue of authority that is before us, we examine the outer limits of the historical authority of grand juries to render reports. In jurisdictions that do permit grand jury reports, they usually are limited to public affairs as opposed to public persons, or if permitted to extend to named public officials they usually may comment upon only their conduct of affairs short of crime.[11]

In United Electrical, supra, the court expunged a report that did not concern

---

10. See also the El Paso case, supra, 479 F.2d at 460–61 n. 2.

In a very recent case the District of Columbia Superior Court adopted what it termed the federal rule that grand juries do not even have authority to publish reports on the condition or management of public institutions or affairs. It sealed a report dealing in detail with supposed wrongdoing by specific individuals employed at a District of Columbia hospital. In Re Recommendation of Grand Jury of Dec. 6, 1974, 16 Cr.L. 2395 (D.C.Super.Ct., 1/23/75).

11. See Wisdom, J., in his opinion in Cox, 342 F.2d at 186 n. 2:

"The encomia addressed to the inquisitorial role of the grand jury properly apply to the traditional common law jury or a jury in those States still giving the jury a free rein in the exercise of its inquisitorial power. Federal grand juries, as distinguished from State grand juries, do not have the power of the latter to investigate public institutions or the actions of public officials, *where they have no reason to believe that a crime has been committed.*"

See also the El Paso case, supra, 479 F.2d 460 n. 2; United Electrical, supra, 111 F.Supp. at 867–68.

matters of a general nature touching on conditions in the community but broadly accused private persons—labor union officials—of false swearing in executing noncriminal affidavits. In Hammond v. Brown, *supra*, the federal district court expunged the report of an Ohio state grand jury which had indicted 25 persons in connection with events occurring in May 1970 at Kent State University. The report charged 23 unindicted faculty members with sharing responsibility for tragic shootings by national guardsmen. It assigned major responsibility to the administration of the university and rendered sweeping moral and social judgments on policies, attitudes and conduct of the administration and of some faculty and students.

Judge Sirica, in the Watergate grand jury case, In re Report and Recommendation of June 5, 1972 Grand Jury, *supra*, upheld the power of the federal grand jury to render a report which was "a simple and straightforward compilation of information gathered by the Grand Jury, and no more." 370 F.Supp. at 1226. He distinguished the report before him from those held to be unauthorized in *United Electrical* and Hammond v. Brown on the ground it drew no accusatory conclusions and deprived no one of an official forum in which to respond. *Id.*

The Seventh Circuit, in Application of Johnson, 484 F.2d 791 (CA7, 1973), declined to suppress a grand jury report concerning a confrontation between Chicago police and members of the Black Panther Party in which two party members were killed, and in so doing distinguished *Hammond* and *United Electrical* on the ground that the report before it charged no petitioner with illegal activity.[12]

■ Despite the variation in views concerning the limits of grand jury power to issue reports, we find no substantial authority permitting a federal grand jury to issue a report accusing named private persons of criminal conduct. We perceive no persuasive reason why the federal grand jury should be permitted to do by indictment what it could not do within the historical outer limits of a grand jury report.[13] Indeed, if a choice of evils were necessary, accusation by indictment, a legal tool more familiar to the public at large and also more precisely targeted, would seem to be the more objectionable.

■ The courts have struck down with strong language efforts by grand juries to accuse persons of crime while affording them no forum in which to vindicate themselves. Thus, *United Electrical* (with respect to reports):

> While the courts have given special reasons, varying with the jurisdiction, for expunging reports of a specific nature, the main ground relied upon by all is one of policy. Broadly stated, that ground is that a man should not be subject to a quasi-official accusation of misconduct which he cannot answer in an authoritative forum. The Grand Jury, it is thought, when it

---

**12.** Congress recently authorized special grand juries for major population centers having major organized crime activity. 18 U.S.C. §§ 3331–34. A special grand jury organized under this statutory authority is specifically authorized to submit a report concerning "noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation of removal or disciplinary action." 18 U.S.C. § 3333(a). A number of procedural safeguards are built into the legislation. Before the report can be filed as a public record it must be reviewed by the district court which must determine that it is supported by a preponderance of the evidence, and, under designated circumstances, the court must be satisfied that each person named in the report and a reasonable number of witnesses named by him have had an opportunity to testify before the grand jury, and that the report is not critical of any identified person. 18 U.S.C. § 3333(b). The report must be sealed and a copy served on each public officer or employee named therein. Each such person has a right to appeal prior to the report's being accepted. Also he may file an answer to the report, which becomes an appendix to it. 18 U.S.C. § 3333(c).

**13.** We set out *infra*, in the discussion of due process, governmental interests that arguably might be served by accusing the private citizen of crime by indictment but without making him a defendant, and reject as insubstantial the interests that we can identify.

issues such reports, is imposing the punishment of public reprimand—a punishment based upon ex parte proceedings which have not yielded enough evidence to warrant indictment. When it does this it defeats the very purpose of its existence. While the State courts have, for the most part, countenanced general reports which do not single out individuals, they have uniformly condemned specific censure by the Grand Jury. And the commentators are in accord that such censure should not be permitted. 111 F.Supp. at 867–868. People v. McCabe, 148 Misc. 330, 333, 266 N.Y.S. 363, 367 (1933), with respect to a presentment,[14] said:

A presentment is a foul blow. It wins the importance of a judicial document; yet it lacks its principal attributes— the right to answer and to appeal. It accuses, but furnishes no forum for denial. No one knows upon what evidence the findings are based. An indictment may be challenged—even defeated. The presentment is immune. It is like the "hit and run" motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed.

In dismissing a grand jury report that accused state judges and attorneys of wrongdoing either criminal or little short of criminal, the Florida Supreme Court said this:

The medieval practice of subjecting a person suspected of crime to the rack and other forms of torture is universally condemned; and we see little difference in subjecting a person to the torture of public condemnation, loss of reputation, and blacklisting in their chosen profession, in the manner here attempted by the grand jury. The person so condemned is just as defenseless as the medieval prisoner and the victim of the lynch mob . . .

State v. Interim Report of Grand Jury, 93 So.2d 99 at 102 (Fla., 1957).

Public accusation of misconduct through use of a non-indicting indictment is subject to the same comments just quoted (although we recognize the seductive appeal springing from familiarity with the practice of using the device and from absence of prior attack upon it).

We have referred to the second function of the grand jury, that of serving as a shield for the citizen against baseless charges of crime and from misuse of power by prosecutor and court. The grand jury that returns an indictment naming a person as an unindicted conspirator does not perform its shielding function but does exactly the reverse. If the charges are baseless, the named person should not be subjected to public branding, and if supported by probable cause he should not be denied a forum. Failure of the grand jury to perform its shielding function where appropriate may be explained by the tendency of the body, with its members not learned in the law, to follow the lead of the prosecutor, who is its legal advisor. We are told that in this instance the origin for the grand jury's action was the prosecutor.

[W]e submit that *it is within the prosecutor's discretion to recommend* to the grand jury that named co-conspirators should or should not be indicted together with the principal defendants, and that *where, as here, the grand jury acquiesces in that recommendation*, it cannot be said to have acted illegally. [Emphasis added.]

Brief for the United States, p. 27.[15]

---

**14.** A presentment can be described as an accusation, initiated by the grand jury itself, and in effect an instruction that an indictment be drawn. While constitutionally permitted, the practice of using presentments has disappeared in the federal system and is not provided for in F.R.Crim.P. Rules 6 and 7. *See*

Notes of the Advisory Committee, 18 U.S.C.A. p. 140. *See also* opinion of Brown, J., in *Cox*, 342 F.2d at 184.

**15.** We do not rest our decision upon separation of powers. We observe, however, that a prosecutorial recommendation to charge a person but not name him as a defendant passes

■ Next we turn to constitutional limitations on the grand jury. "The grand jury . . . need not provide all . . . procedural guarantees." Jenkins v. McKeithen, *supra*, 395 U.S. at 430, 89 S.Ct. at 1853, 23 L.Ed.2d at 422. It does not, however, enjoy blanket exemption from the commands of due process. The absence with respect to the grand jury of procedural safeguards required in other contexts is but an application of the usual rule that due process requirements vary according to particular circumstances. The role the sovereign plays and the nature of the governmental interest are weighed against the harm or loss resulting to the individual. *See, e. g.*, Wisconsin v. Constantineau, *supra*; Jenkins v. McKeithen, *supra*; Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); and Greene v. McElroy, *supra*.

One indicted by a grand jury has no right to appear before that body, under oath or otherwise. He is not entitled to present evidence or to have particular persons called as witnesses. He has only a limited right to counsel if he appears, and no right to be present in person or by counsel while evidence is being presented. He has no right to confrontation and to cross-examination, and no right to present argument. He is not entitled to know the identity of the witnesses who testified concerning him, and even after the grand jury has completed receiving evidence, its evidence is unavailable to him. He may not demand a statement of reasons supporting the body's conclusion. The evidence and the witnesses underlying the grand jury's action surface, if at all, at a criminal trial.

The incidents of due process afforded an unindicted conspirator are more limited than those available to one named as a defendant. The unindicted conspirator is not a party to the criminal trial where names and facts come to light, and he has no right under the Federal Rules of Criminal Procedure to intervene. If he is a witness at the trial, which is at least a possibility, he may be excluded from the courtroom except when testifying. And finally, of course, a decision in the trial that the defendants were not guilty of criminal conduct neither vindicates him nor bars his being subsequently indicted and tried as a defendant.[16]

In part II, *supra*, we have already discussed the harm to the citizen who is accused but not indicted. To further the necessary process of weighing this private injury against governmental interest we have sought to discern what legitimate interests of the government are served by stigmatizing private citizens as criminals while not naming them as defendants or affording—in this case, indeed, affirmatively opposing—access to any forum for vindication. The Department of Justice suggests nothing that rises to the dignity of a substantial interest. The Department does state in conclusory terms that "the interest of justice may on occasion require that [unindicted conspirators] be named in the indictment." These "interests of justice" are not identified, and the cases cited in support concern naming in the indictment the victim of crime where necessary to protect the defendant.

■ There is at least an implication that in this instance naming Beverly and Chambers was considered necessary in order to prove, or facilitate the proof, of conspiracy by the persons named as de-

---

from the executive branch to the grand jury the implementation of a decision to prosecute or not to prosecute.

16. A person might agree to cooperate with prosecuting authorities by voluntarily giving self-incriminating testimony before a grand jury, and that testimony might form the basis of his being named in an indictment as an unindicted conspirator. The consequences of such action are not involved in this case, for neither appellant testified. Both refused to testify even after being ordered to do so pursuant to a grant of immunity. Each time they went to jail rather than testify. The first time they were freed by order of this court, the second by order of a Supreme Court justice. *See* Beverly v. United States, 468 F.2d 732, 737–38, n. 10, and 740–41, n. 13 (CA5, 1972).

fendants. We are left to speculate as to the precise form such necessity (or convenience) might take. Possibly the government means that its chance of obtaining a conspiracy conviction of persons named as defendants is increased by attributing to the named defendants the acts of a greater number of persons. But the indictment may make such additional persons defendants if there is probable cause to believe that they participated in the alleged conspiracy. We have been tendered no reason why in this case, if there was probable cause, the appellants were not included among those made defendants. Obviously, if there was no probable cause, they should not have been named as conspirators—indicted or unindicted. Additionally, if the prosecutorial goal is to expose the named defendants to the broadest possible attribution of the acts of others, it can be attained without actually naming non-defendants as unindicted conspirators. The government may introduce evidence at trial of a person's participation in a conspiracy and thereby ascribe his acts and statements to the co-conspirators even if that person is not named in the indictment.[17]

In the instant case, Count One charged that the named conspirators conspired "with divers other persons, *some known* and *others unknown* to the grand jury." We have not been told why the two appellants were named while other persons who were alleged to be conspirators and whose identity was known were left behind the protective cloak of anonymity.

Finally, we know of no reason why, if the indictment wishes to center upon a specific person but not name him as defendant, he cannot be described as "John Doe."

An unindicted conspirator anonymously designated as an "other person" or as "John Doe" may be unmasked in a bill of particulars or at trial. The bill of particulars is, however, the statement of the prosecutor and does not carry the imprimatur of credibility that official grand jury action does. At least arguably its public impact may be tempered by protective orders entered by the court. When a witness testifies at trial he does so as a private individual and makes no formal adjudication regarding criminality. An indictment, the formal act of an impartial, formally convened quasi-judicial body of historical status and power, carries more impact on the reputation of its subject than does trial testimony. In any event, it must be recognized in the process of balancing private injury and governmental interests that wholly different, and valid, governmental interests apply to naming the private citizen in a bill of particulars or in trial testimony than apply to identifying him in the indictment as an unindicted conspirator.

If the implied governmental interest of "necessity to prove the conspiracy" relates to inducing persons to testify as prosecution witnesses, the government has available other and less injurious means than those employed in this case.

Nine of the ten persons named in the indictment were active in the Vietnam Veterans Against the War, an anti-war group. The naming of appellants as unindicted conspirators was not an isolated occurrence in time or context. The same procedure was employed in other cases.[18] *See* Note, Federal Grand

**17.** *See* Cooper v. United States, 256 F.2d 500, 501 (CA5, 1958); Heflin v. United States, 132 F.2d 907, 909 (CA5, 1943); Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269, 270–71 (1895). *See also* United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, 1060 (1974).

**18.** *See, e. g.*: U. S. v. Dellinger, No. 69 Cr. 180 (N.D.Ill., indictment filed Mar. 20, 1969). "Chicago Seven" trial of anti-war activists charged with substantive violations of federal statutes and conspiracy to disrupt 1968 Democratic national convention; 20 named as alleged co-conspirators, of whom 8 were made defendants and 12 unindicted. Seven defendants were acquitted of conspiracy. Two defendants were acquitted and five convicted of substantive violations Feb. 14, 1970; on appeal, reversed and remanded for new trial, 472 F.2d 340 (CA7), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). Indictment dismissed Jan. 18, 1973.

U. S. v. Marshall, No. 51942 (W.D.Wash., indictment filed April 16, 1970). Anti-war activists charged with conspiracy; 16 named as

Jury Investigation of Political Dissidents, 7 Harv.Civ.Rts.-Civ.Lib.L.Rev. 432 (1972). There is at least a strong suspicion that the stigmatization of appellants was part of an overall governmental tactic directed against disfavored persons and groups. Visiting opprobrium on persons by officially charging them with crimes while denying them a forum to vindicate their names, undertaken as extra-judicial punishment [19] or to chill their expressions and associations, is not a governmental interest that we can accept or consider. It would circumvent the adversary process which is at the heart of our criminal justice system and of the relation between government and citizen under our constitutional system. It would be intolerable to our society. ▉▉▉ Having balanced the governmental interest in the grand jury's functions and the harm caused thereby to individuals, we conclude that so long as the federal grand jury acts within the limits of its powers to investigate, to indict, and possibly to issue limited types of reports, the governmental interest in these important and historical functions tips the balance against requiring the full panoply of due process. Here, with respect to Beverly and Chambers, the

grand jury acted beyond its historically authorized role, and we are shown no substantial interest served by its doing so. The balance tips wholly in favor of the adversely affected appellants. The scope of due process afforded them was not sufficient.

The extent to which the grand jury could be constitutionally authorized to act beyond the powers presently conferred upon it by common law and statutes, and the exact contours of procedural due process that then would be required in a balancing process to protect the interests of persons affected, is not for us to decide in this case.[20] What we do decide is that this particular grand jury's actions with regard to these appellants exceeded its powers and violated due process as well.[21]

### IV. The power to expunge.

▉▉▉ The grand jury has been variously viewed as an arm of the court, as an instrumentality of the people,[22] and as an adjunct of the judiciary but with the power to act, within certain bounds, independently of the traditional branches of government. We conclude, without the necessity of adopting a particular characterization, that a federal court has

alleged co-conspirators of whom 8 were made defendants and 8 unindicted. The trial of the eight defendants ended in mistrial Dec. 14, 1970, and there have been no further proceedings.

U. S. v. Ahmed, No. 14950 (M.D.Pa., indictment filed April 30, 1971). Catholic anti-war activists charged with conspiracy and other federal offenses; 12 named as alleged co-conspirators of whom 8 were made defendants and 4 unindicted. Conspiracy charges dismissed March 27, 1972. Two defendants were, however, convicted of other substantive violations; on appeal the convictions were affirmed in part, reversed in part sub nom. United States v. Berrigan, 482 F.2d 171 (CA3, 1973).

U. S. v. Russo, No. 9373 (C.D.Cal., indictment filed Dec. 29, 1971). "Pentagon Papers" case; four named as alleged co-conspirators, of whom two were made defendants and two unindicted. Proceedings terminated in dismissal May 11, 1973.

U. S. v. Rudd, No. 70 Cr. 195 (N.D.Ill., indictment filed April 7, 1972). S.D.S. "Weathermen"; 40 named as alleged co-conspirators of whom 12 were made defendants and 28 unindicted. Indictment dismissed January 3, 1974.

U. S. v. Ayres, No. 48104 (E.D.Mich., indictment filed Dec. 7, 1972). S.D.S. "Weathermen"; 39 named as alleged co-conspirators, of whom 15 were made defendants and 24 unindicted. Indictment dismissed Oct. 15, 1973.

19. "Public censure by an agency of the judiciary [the grand jury] is punitive in any practical sense of the word." In re Presentment by Camden Grand Jury, 34 N.J. 378, 169 A.2d 465, 478 (1961) (concurring opinion).

20. See note 13, *supra,* describing the procedural safeguards erected by Congress with respect to issuance by special grand juries of certain kinds of reports.

21. These conclusions make it unnecessary for us to decide whether we would reach the same result under our supervisory powers.

22. United States v. Cox, *supra,* 342 F.2d at 178 (Rives, Gewin and Bell, JJ.), *id.* at 184 (Brown, J.) and *id.* at 190 (Wisdom, J.); In re Report and Recommendation, *supra,* 370 F.Supp. at 1222.

the power to expunge unauthorized grand jury action. In the *El Paso* case, over insistence by the government that we lacked power, we ordered expunction of parts of a grand jury report relating to non-federal subject matter and serving no federal purpose. In Branzburg v. Hayes, *supra,* 408 U.S. at 688, 92 S.Ct. at 2660, 33 L.Ed.2d at 644, the Court noted that "the powers of the grand jury are not unlimited and are subject to the supervision of a judge."

We have already pointed out in part II the exercise by the district court, over government objection, of the power to protect unindicted conspirators in the Johns-Manville antitrust litigation.[23] Application of American Society for Testing and Materials, 231 F.Supp. 686 (E.D.Pa., 1964), and Application of Turner and Newall, Ltd., 231 F.Supp. 728 (E.D.Pa., 1964). Prior to trial of the first group of defendants American Society for Testing and Materials (ASTM) filed a "statement . . . setting forth . . . the predicament in which it was placed by being named in the Indictment without being made a defendant." 231 F.Supp. at 687. ASTM participated in the trial, though to what extent is not clear. At the conclusion of the government's case ASTM moved to strike the portions of the indictment referring to it. The court entered a memorandum that the parts in question should be "considered as having been deleted," and later, at the request of ASTM, instructed the jury to ignore those parts because there was no evidence to justify them. All named defendants in trial were acquitted.

During trial ASTM had also filed a separate action requesting expunction and entry of formal findings that it had not committed the violations charged against it. After trial this separate suit was heard. The court rejected the government's argument of lack of jurisdiction. ASTM offered testimony from the criminal trial plus additional testimony and more than 100 exhibits. The court indicated it would enter appropriate findings of fact protecting ASTM, with a right in the government to come forward with an offer of evidence to the contrary in an upcoming trial of other defendants.[24] The court directed that there be attached to the particular paragraphs of the indictment a reference to the court's order "so that the court's records will not improperly reflect on a corporation which is entitled to the presumption of innocence."

The other unindicted conspirator, Turner and Newall, filed after trial a motion to expunge, which was treated by the court as a separate suit. 231 F.Supp. 728. The court overruled the government's jurisdictional objections and granted relief similar to that granted ASTM.

The government, while contending these two cases were wrongly decided, also attempts to distinguish them on the ground that the motions were made later in the proceedings than in the instant case and that relief was granted after the court had a record on which to determine if there was any basis to support the allegations of the indictment. This misses the mark. *ASTM* and *Turner and Newall* represent an ad hoc approach that presumably was reasonably satisfactory to the affected parties since neither appealed from denial of pre-trial relief. At best the remedy they offer is a poor one. If the movant is successful, relief comes only after a trial at which the formal charge of criminal conduct inevitably has been given greater currency. If he is unsuccessful, added dignity is given to his criminal label by judicial refusal to remove it, a decision made after examination of a record to which the victim is not a party. In the final analysis, of course, probable cause on the

---

**23.** The case is described in United States v. Johns-Manville Corp., 213 F.Supp. 65 (E.D.Pa., 1962).

**24.** Presumably the court considered its order did not have the effect of a judgment of acquittal of ASTM but was to protect it against further public disrepute unless the government could adduce more evidence at the second criminal trial than it had at the first.

basis of which the grand jury might have made the unindicted conspirator a defendant is unrelated to the question of whether the grand jury may accuse him without making him a defendant. Finally, these two cases graphically demonstrate the awkwardness of attempting, at trial and after trial, to protect the interests of the named but unindicted conspirator.

### V. Sovereign immunity and grand jury immunity.

 Sovereign immunity does not bar appellants from relief. That doctrine precludes private suits against the United States which would result in a drain on the public treasury or would inhibit the necessary and proper functioning of government. *See* Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209, 1216 (1947); Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15, 23 (1963). This is not such a proceeding. Beverly and Chambers asked no substantive relief against the government but rather made only a comparatively mild request to strike from the indictment charges that the government was not able to show served any substantial purpose. A request to expunge, in the circumstances here presented, at the request of persons having standing, was no more subject to the defense of sovereign immunity than the filing of a bill of particulars or the raising of an objection to the indictment by the named defendants.[25]

 Grand jurors, individually and collectively, enjoy a privilege assertable in suits for defamation;[26] but that privilege is not applicable to bar the petition of appellants to remove language from the indictment. Neither monetary damages nor an order against the grand jury was sought. Rather appellants sought equitable relief that would not interfere with the jury's proper functioning. Compare Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, 294–95 (1967).

### VI. Grand jury secrecy.

The conclusions which we reach with respect to the power of the grand jury and the demands of due process make it unnecessary for us to discuss the issue of whether naming a person as an unindicted conspirator without making him a defendant violates the requirements of grand jury secrecy.

### VII. Appellate jurisdiction.

 In the *El Paso* case we had no doubt of the jurisdiction of the Court of Appeals to consider and act upon the order of the District Court nor do we entertain any doubt in this case. Beverly and Chambers filed a notice of appeal, and (as in *El Paso*) we have referred to them as appellants, but the court may consider the matter as a petition for a writ of mandamus.[27]

### VIII.

The decision of the District Court is vacated and the cause is remanded with directions that the District Court order that the Clerk of the United States District Court for the Northern District of Florida expunge from Count One of the indictment described above all references to appellants.

Vacated and remanded with directions.

---

25. Also, where a federal officer or agency acts beyond the scope of its power the act is "*ultra vires* . . . and . . . may be made the object of specific relief." Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628, 1636 (1949). *See also* Dugan v. Rank, 372 U.S. 609, 621–22, 83 S.Ct. 999, 10 L.Ed.2d 15, 24 (1963).

26. Restatement (Second) of Torts, § 589 (Tent. Draft No. 20, 1974).

27. This is what the Seventh Circuit did in Application of Johnson, 484 F.2d 791 (CA7, 1973). Indeed, Beverly and Chambers, in an excess of caution, have couched their presentation to us in the general form of a petition for an extraordinary writ.