352 So.2d 518 (1977)
MIAMI HERALD PUBLISHING COMPANY, a Division of Knight-Ridder Newspapers, Inc., al Messerschmidt and Gore Newspapers Company, Appellants,
v.
The Honorable Paul M. MARKO, Circuit Court Judge, Appellee.
Nos. 50192, 50266.
Supreme Court of Florida.
November 17, 1977.
Parker D. Thomson and James D. Spaniolo of Paul & Thomson, Miami, John W. Fleming of Fleming, O'Bryan & Fleming, Fort Lauderdale, and Robert L. Shevin, Atty. Gen., James D. Whisenand, Deputy Atty. Gen., and Sharyn L. Smith, Asst. Atty. Gen., Tallahassee, for appellants.
Bruce M. Lyons of Di Giulian, Spellacy, Bernstein, Lyons & Sanders, Fort Lauderdale, Andrew I. Friedrich, West Palm Beach, and John D. O'Donnell of Panza, O'Donnell & Jacobson, Fort Lauderdale, for appellee.
ENGLAND, Justice.
We have for review by direct appeal a final order entered by the Broward County Circuit Court which initially and directly upheld the validity of Section 905.28(1), Florida Statutes (1975).[1] At issue is the *519 constitutionality of the statutory scheme which allows the repression of "improper and unlawful" statements in a grand jury presentment relating to an individual against whom no indictment or true bill has been voted. The statute provides:
"(1) No report or presentment of the grand jury relating to an individual which is not accompanied by a true bill or indictment shall be made public or be published until the individual concerned has been furnished a copy thereof and given 15 days to file with the Circuit Court a motion to repress or expunge the report or that portion which is improper and unlawful."
On June 16, 1976, the Broward County Grand Jury presented to Circuit Judge Paul M. Marko an Interim Grand Jury Report which named John Roger Fix and John Cox, two Florida Highway Patrolmen, as central figures in an investigation of the fatal shooting of J.W. Nimmo. Neither patrolman was indicted, but the Report described acts of misconduct by the patrolmen in the performance of their duties and offered apparently critical recommendations.
Acting under Section 905.28(1), each patrolman timely filed a motion to repress certain portions of the Report on the ground that the challenged portions were "improper and unlawful". Following a hearing on these motions at which appellants were granted standing to participate,[2] the judge released for publication three of the Report's four pages. He repressed the only other page because seven words on it "constitute a recommendation" which "is not a `fair' report", and "the Court cannot strike the [seven] words ... without destroying the entire meaning of page 4... ."
The material allowed to be made public is fairly summarized in appellants' brief as follows:
1. Pursuant to an unauthorized investigation the Highway Patrolmen entered an apartment where J.W. Nimmo and three other black men were found engaged in actual or constructive possession of illegal drugs;
2. Patrolman Fix in attempting to effectuate an arrest and in reasonable belief that he was threatened, fatally shot Nimmo, the homicide being justifiable;
3. After the fatal shooting Patrolman Fix decided to plant a handgun near the body of Nimmo, but was persuaded by Patrolman Cox not to do so;
4. Patrolman Cox did not mention the intended planting of the gun to investigating officers;
5. The actions of the Highway Patrolmen were taken at a location outside their normal assigned work stations, Patrolman Cox was elsewhere than he had reported, and the investigation by the Highway Patrolmen was not within their normal duties and unauthorized.
Appellants contend that the statute is basically in conflict with the First Amendment of the United States Constitution and Article I, Section 4 of the Florida Constitution, in that it denies access to public information and thereby impinges on the rights of a free press. Relying principally on our opinion in Morgan v. State, 337 So.2d 951 (Fla. 1976), appellants argue that free press rights must predominate over other constitutionally protected interests (such as the right to privacy), unless those other constitutionally protected interests are "substantial, imminent and subordinating". They suggest, of course, that no such compelling circumstances are present here.
In support of Judge Marko's repression ruling and in defense of the statute, the patrolmen assert a constitutional right of privacy. They suggest that any right of public access to the written findings of a grand jury is outweighed by their individual *520 right to protect their reputations from unfounded and improper scandal and abuse. For this proposition they rely principally on our opinion in State ex rel. Brautigam v. Interim Report of Grand Jury, 93 So.2d 99 (Fla. 1957).
Appellants suggest alternately that we need not resolve the conflict of alleged constitutional rights asserted here because a less drastic resolution of the case is available. They agree with the Attorney General[3] that the statute can be cured of any potential defect simply by placing a limiting construction on the terms "improper and unlawful". The construction they suggest is that "unlawful" means outside the lawful ambit of grand jury authority, and that "improper" connotes a report of matters which lack a factual foundation in the record.
An analysis of the constitutional claim asserted by the patrolmen presents no barrier to our upholding the statute as appellants suggest. For one thing, there is no constitutional right of privacy to the extent here asserted.[4] For another, the reliance of the patrolmen on Brautigam is not completely justified. Notwithstanding the broad sweep of language contained in that opinion, there is little parallel between that case and this. Three major differences appear. First, in this case the matters repressed were described by the trial judge as unfair recommendations of the grand jury, whereas in Brautigam the matters disclosed were equated with indictable crimes for which no indictment had been returned. Second, in this case the information reported by the grand jury will forever be barred from public view under the trial judge's ruling, while in Brautigam the information had already been made public before repression was attempted. Third and most significantly, Brautigam was decided in the context of inherent judicial power to suppress judicial records, while this case tests the patrolmen's repression rights against explicit statutory standards.
Stripped to its essentials, then, this case does not implicate the Constitution. It requires only a construction of the presentment statute and an analysis of the underlying rationale which has led the legislature to conclude that some limitation, other than judicial oversight, should be imposed on the discretion of a grand jury to report its findings.
In considering whether statements in a "no indictment" grand jury report can be repressed on the ground that public officials may be exposed to criticism, scorn, or recommendations unfavorable to their reputation, it is essential to bear in mind the context in which the issue arises. Unlike the opportunity for refutation which is available when adverse character or reputational matters are disclosed during the course of a public trial, there is no comparable opportunity to challenge grand jury report disclosures contemporaneously with their publication. These matters emerge from a grand jury process which has operated in secrecy, under the guidance of a prosecutor and the supervision of a judge to be sure, but where there has been no right to challenge witnesses or to be represented by counsel. It is possible, then, that the testimony and information presented to a grand jury, on which they must rely and report, is potentially one-sided and inaccurate. Thus, while one charged with the commission of a crime as a result of this process has a full opportunity for public clarification of misleading data and personal vindication through a public trial, no comparable means of vindication exists for one whose character is impugned in a report unaccompanied by indictment.[5] It is *521 undoubtedly for this reason that the legislature has now afforded an opportunity to prevent the publication of unfavorable material through the repression of matter that is "improper and unlawful".[6]
This background provides a frame of reference for analysis of the two statutory limitations imposed on the reportorial privilege afforded grand jurors  that their reports be both "lawful" and "proper".
Lawful. As to the first, no one in this proceeding challenges the broad sweep of powers conferred on grand juries to investigate either specific instances of criminality or general activities of public institutions and personnel,[7] and no one challenges the lawful nature of this grand jury's investigation into circumstances surrounding the death of J.W. Nimmo at the hand of a police official. Counsel for the patrolmen concede both that the 1976 Spring Term Grand Jury could lawfully inquire into alleged police misconduct, and that its inquiry was lawfully performed. There is, then, no controversy between counsel concerning the first statutory criterion, either as to its proper construction or its applicability in this case. We accept appellants' formulation as the proper definition of that term in this statute.[8]
Proper. The patrolmen focus their case for repression on the second statutory criterion, essentially arguing that the published recitations of the Report concerning alleged misconduct reach the outer limits of what a grand jury report without indictments can contain and that any further statements regarding that misconduct, or any recommendations short of the return of criminal indictments, would be "improper". They argue, essentially, for a definition of "proper" which goes beyond mere legal propriety[9] and incorporates considerations of "fairness" to persons discussed in a report. In our view, the precision of the statute precludes adding the refinement which the patrolmen suggest.
We recognize, of course, that the line which appellants ask us to draw between "proper" and "improper" material is not easily announced, and that we cannot here define for all situations the perimeters of permissible and impermissible commentary. Like so many other matters which come to the courts, we can only give content to the legislative directive by evaluating it in the context of the factual situation before us. What is clear, however, is that the focus of judicial inquiry on a motion to repress under this statute does not turn on some amorphous notion of "fairness", but must be addressed to the germaneness and factual foundation of the particular recommendations contained in a report.[10]
*522 The reasons for our reading of the statute proceed from the fact that Florida grand juries are not confined to an indictment function, as is generally the case under federal law.[11] Our grand juries have been given the right to express the view of the citizenry with respect to public bodies and officials in terms of a "presentment", describing misconduct, errors, and incidences in which public funds are improperly employed.[12] It is inevitable under these circumstances that public officials will be subject to criticism and that, at a minimum, their private reputations will be exposed to opprobrium. In a broad sense, that is not "fair".
Obviously, the legislature has elected not to eliminate the potential for citizen criticism of public officials; rather it has chosen to confine those criticisms to matters which emerge from a lawful inquiry and are not "improper". There is eminent good sense in appellants' suggestion that this latter limitation means only that comments in a grand jury presentment must have a factual foundation in, and be germane to, the scope of proceedings for which the grand jury was convened. A report may be "proper" by all objective standards but appear "unfair" to some observers. The notion of unfairness is highly subjective, however, and we fail to discern any legislative directive to add that dimension to the more objective standards specifically set out in the statute.
A reading of the sealed portions of the grand jury report indicates that the materials identified as "unfair" did not offend the statutory test of propriety which must be applied. The repressed portions were nothing more than the grand jury's recommendation that the two officers were unfit to serve as highway patrolmen, and that administrative proceedings should be conducted to have them removed from office. The exact text of the repressed portion, with the "unfair" words underscored, reads as follows:
"and that John Roger Fix, notwithstanding the abandoning of his aforesaid intention to alter the appearance of said apartment, and John Harold Cox, Jr., notwithstanding the disclosure at a later time of his knowledge of the acquisition of said handgun by John Roger Fix, do not possess those qualities which all the citizens of the State of Florida deserve and are entitled to expect from an individual who is charged with, and who assumes, the heavy responsibility of enforcing the laws of the State of Florida, and therefore, your Grand Jury hereby specifically recommends to the Department of Highway Safety and Motor Vehicles that the said John Roger Fix and John Harold Cox, Jr., be dismissed as members of the Florida Highway Patrol, and that the said Department of Highway Safety and Motor Vehicles forthwith conduct an administrative hearing with all constitutional rights afforded for the expressed purpose of terminating the services of the said John Roger Fix and the said John Harold Cox, Jr., as Florida highway patrolmen."
There was nothing improper either in an observation by Broward County citizens that these highway patrolmen are not fit to continue as law enforcement officials, or in a recommendation that administrative proceedings should be conducted to curtail their tenure.[13] These recommendations were consistent with the Report's general recitations regarding their conduct in the Nimmo shooting. In fact, we have previously *523 held that a grand jury may legally recommend the removal of public officials.[14]
This case illustrates the danger of standardless repression grounded solely on considerations of "fairness", and it manifests the legislature's wisdom in setting more precise standards. Trial judges are poorly situated to evaluate possible reputational damage on the basis of what is or is not "fair" to public officials brought before grand juries. Often officials charged with misconduct will be members of the same community in which the evaluating judge sits, compounding the subjectivity of a "fairness" test. If the judicial inquiry is narrowed, however, to the legitimacy of the grand jury proceeding, the factual foundation for the subject matter included in the report, and the germaneness of the reported material to the purpose for which the grand jury was convened and given investigative authority, judicial officers can comfortably employ in these proceedings the same decision making techniques which they use in other judicial inquiries. Moreover, the balance between public officers' "privacy" and the public's general right to know will be struck, in compliance with legislative guidelines, without concern either for personalities or for the necessity of confronting constitutional standards. It follows from all this that the legislative solution now makes it unnecessary to resort any longer to the judicially-crafted standard which was developed in the absence of legislation.[15]
Through all that has been written in praise or in condemnation of the grand jury as a legal institution, most agree that it continues to perform a desirable function "both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action."[16] A society governed by representative officials concomitantly requires citizen review of public action.[17] The grand jury has proven a most effective and reliable mechanism for that purpose. Lay participation in periodic review of the performance of public officials and institutions also tends to foster understanding and respect for the government which has been created by and for the people.[18]
The benefits to be derived from this extraordinary exercise in citizen participation would be severely limited if the fruits of that activity were not available to the public on whose behalf it is undertaken. Implicit in the power of the grand jury to investigate and expose official misconduct is the right of the people to be informed of its findings. While public disclosure of grand jury findings inevitably entails the risk of reputational damage, the legislature has ensured that any potential harm to public officeholders will be the product of their own conduct, and not the consequence of an unrestrained body of misguided citizens.
For these reasons, the order of the trial court is affirmed insofar as it upheld the validity of Section 905.28(1), Florida Statutes (1975); but under the limiting construction given that statute by this decision, that part of the order granting the motion to repress must be reversed. The case is remanded to the trial court for further action consistent with this decision.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD, SUNDBERG, HATCHETT and KARL, JJ., concur.
NOTES
[1] Jurisdiction is vested in this Court pursuant to Art. V, § 3(b)(1) of the Florida Constitution. Although subsection 905.28(2) expressly directs review of circuit court rulings under this statute in the district courts of appeal, the constitutional directive for review ("The supreme court: (1) Shall hear appeals from ... orders of trial courts ... initially and directly passing on the validity of a state statute ... .") overrides any contrary direction in the statute. No one challenges our jurisdiction to review the trial court's decision in this case.
[2] Appellants are two newspaper publishers and a reporter for one of the papers. As they were made parties to the proceeding by the trial judge at an early stage, there is no procedural problem in this case such as vexed the Court in State ex rel. Miami Herald Publ. Co. v. McIntosh, 340 So.2d 904 (Fla. 1977), and English v. McCrary, 348 So.2d 293 (Fla. 1977).
[3] The Attorney General appears in defense of the constitutionality of the statute pursuant to § 16.01, Fla. Stat. (1975), and the decision of this Court in State ex rel. Shevin v. Kerwin, 279 So.2d 836 (Fla. 1973).
[4] The "constitutional" right of privacy has generally been narrowly confined to matters of marital intimacy, procreation and the like. See Laird v. State, 342 So.2d 962 (Fla. 1977).
[5] Appellants suggest that vindication can be achieved through a public hearing on the question of repression. The legislature has chosen a different method, however, and it is not our prerogative to select another alternative.
[6] A similar opportunity, although formulated in terms of "fairness", existed under the court's inherent power over its own process. See State ex rel. Brautigam v. Interim Report of Grand Jury, 93 So.2d 99 (Fla. 1957).
[7] § 905.16, Fla. Stat. (1975), charges the grand jury with the duty to "inquire into every offense triable within the county for which any person has been held to answer, ... and all other indictable offenses triable within the county that are presented to it ... or otherwise come to its knowledge." Grand jury investigations also properly extend beyond the realm of criminal activity to encompass "every offense that affected the morals, health, sanitation, and general welfare," including "institutions, buildings, offices, and officers." In re Report of Grand Jury, 152 Fla. 154, 158, 11 So.2d 316, 318 (1943). See also State v. Clemmons, 150 So.2d 231 (Fla. 1963); Ryon v. Shaw, 77 So.2d 455 (Fla. 1955); Owens v. State, 59 So.2d 254 (Fla. 1952).
[8] In re Grand Jury Proceedings, 479 F.2d 458 (5th Cir.1973), involving a federal grand jury's investigation into state law violations, illustrates "unlawful" grand jury activity.
[9] The patrolmen do not deny that the repressed portions of the Report are based on facts developed in the grand jury's lawful inquiry, or that the matters reported pertain to the patrolmen's misconduct.
[10] Perhaps the difference can be illustrated. If a grand jury was authorized to investigate a homicide, it would be free to return a presentment, with or without indictments, which not only describes the result of their investigation, but which recommends future action to avoid misconduct by public officials of the type found to exist in the matter investigated. The jury would, by this means, reflect the community's legitimate concern for proper law enforcement. It would be "improper", however, for the same grand jury to castigate the governor for choosing to assign a particular state attorney to conduct the investigation.
[11] See United States v. Briggs, 514 F.2d 794, 803 n. 14 (5th Cir.1975), where the court noted that "the practice of using presentments has disappeared in the federal system... ."
[12] See, for example, Owens v. State, 59 So.2d 254, 256 (Fla. 1952) ("It is not required that [public employees and officials] be charged with crime or irregular conduct, [since] if they are incompetent or lax in the performance of the duty imposed on them ... the Grand Jury has a right to investigate and make a fair report of its findings.") See also Note, Grand Jury Presentments: Protection of the Vindicated, 12 U.Fla.L.Rev. 330 (1959).
[13] In fact, partly as a result of these revelations one highway patrolman resigned and the other was suspended from office.
[14] In re Report of Grand Jury, 152 Fla. 154, 11 So.2d 316 (1943), where this Court refused to order expungement of a grand jury recommendation to the Governor that a corrupt constable be removed from office.
[15] See, e.g., State ex rel. Brautigam v. Interim Report of Grand Jury, 93 So.2d 99 (Fla. 1957). The repression statute, enacted as Chapter 73-194, Laws of Florida, took effect on October 1, 1973.
[16] United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).
[17] Cf. Art. V, § 12(a)(3), Fla. Const.
[18] The government, after all, is the people's. Art. 1, § 1, Fla. Const.