Sandy EALY et al., Plaintiffs-Appellants,

v.

Talmadge LITTLEJOHN et al., Defendants-Appellees.

No. 74–3913.

United States Court of Appeals, Fifth Circuit.

March 8, 1978.

---

1. We have found such an itemization of damages necessary in previous cases. *E. g., Noble v. Bank Line, Ltd.,* 5 Cir., 1970, 431 F.2d 520.

Lewis Myers, Jr., Oxford, Miss., John E. Jackson, Jr., Brookhaven, Miss., for plaintiffs-appellants.

Ed D. Noble, Jr., Jackson, Miss., for defendants-appellees.

Before BROWN, Chief Judge, JONES and GOLDBERG, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this 42 U.S.C.A. § 1983 action, the officers and members of the Marshall County United League sought a preliminary injunction against Mississippi officials who had allegedly interfered with the exercise of their First Amendment rights. The District Court denied preliminary relief. We reverse and remand for proceedings not inconsistent with this opinion.

1. The facts set forth here are substantially the same as those found in the unpublished November 11, 1974 Memorandum Opinion of the District Court.

## I.  The Plot

On June 28, 1974, Butler Young, Jr., a twenty-one-year-old black youth, died in Byhalia, Mississippi, from a gunshot wound inflicted by law enforcement officers of Byhalia and Marshall County, Mississippi.[1] The law enforcement officers were not immediately subjected to prosecution by the state, and this delay precipitated protests and boycotts by the black community. The boycotts were organized and supervised by the Marshall County United League, an association of black citizens of Byhalia, Marshall County, Mississippi.

Subsequently, the League was enjoined by the Chancery Court of Marshall County from carrying out the boycotts. Its members and officers then attempted, without success, to enjoin these state court proceedings in federal District Court. On appeal to this Court, we reversed and directed the issuance of an injunction against the enforcement of the state injunction.[2] The latter injunction is now in force and is effective to restrain the state court from interfering with the rights of the parties to engage in peaceful protests and boycotts.

District Attorney Talmadge Littlejohn presented the Butler Young, Jr. incident to the Marshall County grand jury during its August 1974 term. That body did not, however, return indictments against any of the three police officers who had custody of Young the night of his death.

After the grand jury recessed on August 21, 1974, the League prepared and circulated among the citizens of the county a leaflet which accused the law enforcement officers of Byhalia, the county sheriff's department and the state highway department of failing to conduct a serious investigation into the death of Young because he was black. The leaflet also accused Littlejohn of acting as defense attorney for the officers rather than as prosecutor. It addition-

2. *Robinson v. Anderson,* No. 74–3117, 5 Cir., Sept. 9, 1974.

ally labeled the grand jury hearing a "farce." When, on September 6, 1974, the leaflet was brought to the attention of Littlejohn and Judge W. W. Brown of the Circuit Court of Marshall County, an order was immediately entered by Judge Brown calling the grand jury back into session.[3] By law, the term of the Circuit Court ended at midnight, September 7, 1974. But pursuant to Judge Brown's order, the grand jury was to remain in session until it had interrogated all witnesses who, in its judgment, might have knowledge of any improper activities. Through Littlejohn, the grand jury caused subpoenas to issue to all officers and several members of the United League of Marshall County. The records and minutes of the League were also subpoenaed.

On Saturday, September 7, 1974, the grand jury reconvened and remained in session for two days. During that time Littlejohn and the grand jurors conducted an investigation into the origin of the leaflet and the information on which its accusations were based. The grand jury also attempted to ascertain if any of those responsible for the leaflet had any personal knowledge, or knew of any other person having personal knowledge, of the facts surrounding the fatal shooting of Butler Young, Jr.

League members and officers were also questioned about the internal and financial operations and activities of their organization. A final report was made to the court at the conclusion of the investigation, the grand jury recommending that:

> [T]he proceedings of this Grand Jury [be] transcribed by the Court Reporter and that copies of such proceedings be released to the news media, the general public, the District Attorney, the County Attorney, and the Mississippi State Tax Commission, so that a proper evaluation may be made thereof, and appropriate action taken, if advisable as to the matters contained therein.

Report of the Grand Jury, filed September 11, 1974, at 3 (Exhibit 6).

Following the issuance of this report [4] the League filed its § 1983 action against Littlejohn, Judge Brown and D. Rook Moore, the County Attorney.[5] The complaint alleged that the issuance of the subpoenas and the grand jury inquiries into the League's activities, organization, financing, and the leaflet were carried out in bad faith with the purpose of harassing and intimidating the plaintiffs in violation of their First Amendment rights. The plaintiffs requested a temporary, preliminary and permanent injunction [6] restraining the defend-

---

**3.** The order provided in pertinent part:

> WHEREAS it has been brought to the attention of this Court on this 6th day of September 1974 that a publication is being circulated among the citizens of Marshall County, Mississippi that the activities of the Grand Jury pertaining to the matter of the death of Butler Young, Jr., were not properly investigated by the officers and Grand Jury and that the District Attorney is alleged to have acted as defense counsel in said publication; and
>
> WHEREAS the publication indicates that one or more persons has information that the said Grand Jury and/or officers have not carried out their duties as charged under the laws of the State of Mississippi; and
>
> WHEREAS the Court feels that if such information exists that it should be immediately brought to the attention of the Grand Jury which is presently in session, having been recessed on date of Wednesday, August 21st, 1974, and to the Court.
>
> Now, therefore, be and it is hereby ordered that the Grand Jury of Marshall County, Mississippi be convened at 11:00 o'clock A.M. on

date of Saturday, September 7th, 1974 for the purpose of allowing any and all citizens having knowledge of any improper activities pertaining to said death by said officers and Grand Jury proceeding or anything pertaining to the Court, be there presented and a court reporter shall be sworn to secrecy for the purpose of making a record under oath of all proceedings before the Grand Jury which shall be sealed and delivered to the Court upon the completion of the Grand Jury investigation.

**4.** The grand jury report was published in the September 19, 1974 issue of a local newspaper, *The Southern Reporter,* Section 2, at 7 (Plaintiffs' Exhibit 2).

**5.** Moore was dismissed from the action since he had been permitted to recuse himself from the prosecution of the Butler Young homicide.

**6.** The plaintiffs also sought a declaratory judgment that

> Plaintiffs and members of the Plaintiff class have the right, protected by the First Amend-

ants from interfering in the exercise of those rights. It further called for the expunction of portions [7] of the transcript [8] from the state court records and an injunction against Littlejohn and Moore prohibiting them from instituting any prosecution of plaintiffs or plaintiff class based on their grand jury testimony.[9]

## II. The Book Under Review

At the outset of its discussion on the issuance of an injunction, the District Court

pointed to certain issues which it believed did not require consideration.[10] Stating that "the only viable question" before it was "whether the transcript should be made available to state agencies or departments and the public generally," the District Court concluded on the basis of its *in camera* inspection of the transcript that there had been no infringement of plaintiffs' First Amendment rights.[11] The Court then denied injunctive relief, citing and quoting the anti-injunction statute, 28 U.S.C.A. § 2283, and a passage from *Younger v.*

---

ment to the Constitution of the United States and Article 3 Section 13 of the Mississippi Constitution to associate for political purpose without having to answer compulsory process to appear before any grand jury to answer questions concerning said association. And to distribute leaflets and other public statements which are protected by the First Amendment of the Constitution of the United States.

The District Court's Memorandum Opinion did not address the request for declaratory relief and this issue is thus not before us. It will be a matter to be considered by the District Court on remand in framing its final order.

7. The expunction request was directed at testimony:

(a) Regarding the membership of United League of Marshall County (b) Regarding those individuals who associate with the United League (c) Regarding the financial status and financial records of the United League (d) Regarding the minutes of any meeting of United League (e) Regarding the preparation and distribution of the leaflet criticizing the District Attorney and Grand Jury (f) Regarding who has attended the meetings of the United League (g) Regarding how and why the boycott of Byhalia began and any and all testimony by the Plaintiffs and Plaintiff class that is protected by the First Amendment.

8. The complaint did not specifically seek expunction of the grand jury report, but such relief was requested during the hearing on the preliminary injunction (Tr. at 190–92) and it is also sought here (Appellant's Brief at 16–24).

9. On September 17, 1974, the District Court entered a temporary restraining order enjoining the publication of the grand jury proceedings, effective through September 27, 1974. The order was extended from time to time by subsequent court orders, and was in effect at the time of the District Court hearing.

Two days before the conclusion of the hearing, State Circuit Judge Brown issued an order dated October 21, 1974, directing that the transcript of the grand jury proceedings be sealed

and not made available to the public and news media. The order, however, stated that the transcript could be "inspected by any future Grand Jury of Marshall County, Mississippi, or any State or Federal officer in their line of duty upon application to the Court." Court Exhibit 1, at 2.

On November 20, 1974, the Fifth Circuit, through Judge Simpson, granted an injunction pending appeal for a fifteen-day period. Subsequently, a panel of the Fifth Circuit denied a motion for a stay pending appeal and a petition for injunction pending appeal. R. at 57.

10. The District Court stated:

The question of whether plaintiffs or any member of the league should be required to appear before the grand jury and give evidence regarding the activities of the league is not viable since the grand jury proceedings have terminated. Neither is this an action to restrain the district attorney from prosecuting plaintiffs on indictments growing out of the grand jury investigation. This action does not involve a threatened prosecution by the district attorney.

Memorandum Opinion at 7.

11. The Court stated:

It does not appear from a review of the transcript that its publication would result in injury to plaintiffs nor impinge on any constitutional right to which plaintiffs are entitled. For the most part the transcript reveals a colloquy between the district attorney and, at times, members of the grand jury on the one hand and the members of the league on the other hand. The subject of the controversy relates mainly to the question of whether the league had justifiable grounds on which to question the actions of the district attorney and the grand jury in considering the Butler Young, Jr., matter. One of the issues also was whether those responsible for the publication of the leaflet had personal knowledge of material facts surrounding the death of Butler Young, Jr., or knew of any person who was in possession of such facts.

Memorandum Opinion at 8.

*Harris,* 1971, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669, 675.[12]

On the question of expunction, the District Court concluded that the state court was the proper forum to entertain such a claim. In answering the plaintiffs' contention that a state remedy might prove troublesome since it was Judge Brown who would necessarily have to hear such a case, the Court below pointed out that the plaintiffs would have open to them the right of appeal.[13]

Lastly, the District Court held that the plaintiffs had not met the prerequisites set forth in *Canal Authority v. Callaway,* 5 Cir., 1974, 489 F.2d 567, for granting extraordinary relief.

We do not agree with the District Court.

First, we take exception to the manner in which "the only viable issue" was framed. Even assuming that there was but one viable issue,[14] it was *not* whether the transcript should be made available to state agencies or departments and the public generally. Judge Brown's October 21, 1974 order expressly stated that the grand jury proceedings were not to be made available to the public and the news media.[15] Furthermore, that same order would allow not only state agencies to seek court permission to examine the grand jury proceedings but

federal officials and future Marshall County grand juries as well.[16]

Second, for reasons discussed more fully below, we cannot agree that there was no abridgement of plaintiffs' First Amendment rights.

Third, to the extent that the District Court relied on 28 U.S.C.A. § 2283 to stay its hand, such reliance in a § 1983 action was misplaced in view of the Supreme Court's clear holding in *Mitchum v. Foster,* 1972, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705, that § 1983 is an expressly authorized exception to the anti-injunction statute.

Fourth, as discussed in Part IV, reliance on *Younger v. Harris, supra,* is a much more complicated matter than the District Court opinion would indicate.

Fifth, if the District Court believed that the availability of a state judicial remedy absolutely barred federal relief,[17] it was in error. *Monroe v. Pape,* 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, is clear precedent for holding that those whose civil rights have been violated need not look first to state courts for their redress.

Because of the result we reach here, our attention will focus primarily on (i) the substantive § 1983 claim involving the First Amendment violation; and (ii) the applica-

---

**12.** "This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."

**13.** We are not sure whether the District Court was in effect holding that plaintiffs had not exhausted their state remedies; or whether the availability of an adequate state remedy militated against a finding of irreparable injury necessary to warrant federal equitable relief; or whether the availability of the state remedy was cause for abstention. See argument on defendants' motion to dismiss, at Tr. 9–14.

**14.** While we agree with the District Court that the plaintiffs did not seek to restrain defendant Littlejohn from prosecuting plaintiffs *on indict-*

*ments* growing out of the grand jury investigation, see note 10, *supra,* the action did seek an injunction restraining Littlejohn from instituting any proceedings against the plaintiffs based on their testimony before the grand jury. See text at note 9, *supra.*

**15.** At least with respect to public release, this order is an example of "TL²": too little, too late. See note 4, *supra.*

**16.** See note 9, *supra.*

**17.** See note 13, *supra.* We also note in passing that at least one federal court, holding it had pendent jurisdiction to a § 1983 claim to determine whether a state grand jury exceeded its authority, granted expunction relief as to certain material contained in a state grand jury report which violated plaintiffs' First Amendment rights. *Hammond v. Brown,* N.D.Ohio, 323 F.Supp. 326, 343, 348, *aff'd,* 6 Cir., 1971, 450 F.2d 480, 482.

bility of the doctrine of equitable restraint to the unique fact situation presented here.

### III. The Premiere Amendment

■ We begin our foray into the appellants' § 1983 claim with the observation that the right of association guaranteed by the First and Fourteenth Amendments is zealously guarded by this Nation's courts. *E. g., Gibson v. Florida Legislative Comm.*, 1963, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929; *NAACP v. Alabama*, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. The officers and members of the United League of Marshall County are free to enjoy that right. *See id.*; *NAACP v. Button*, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; *Bates v. Little Rock*, 1960, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480. They are also beneficiaries of a right fundamental to the democratic process: to speak their minds free of unwarranted governmental restraint. *See, e. g., NAACP v. Button, supra.*

■ Equally important to the democratic process is the grand jury which serves two salient functions. First, it determines if there is probable cause to believe a crime has been committed; second, it shields citizens from arbitrary and oppressive governmental action. *E. g., United States v. Briggs*, 5 Cir., 1975, 514 F.2d 794, 800. The grand jury and other investigatory bodies operate on the premise that the public is entitled to every citizen's evidence unless protected by privilege. *Branzburg v. Hayes*, 1972, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 664; *see also United States v. Bryan*, 1950, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884; *Gibson v. Florida Legislative Comm., supra.* "Because [the grand jury's] task is to inquire into the existence of possible criminal conduct and to return only well-founded indict-ments, its investigative powers are necessarily broad." *Branzburg, supra*, 408 U.S. at 688, 92 S.Ct. at 2660, 33 L.Ed.2d at 643.

■ The powers of a grand jury are not unlimited, however; nor are the rights to associate and speak freely. In the face of a clear collision between First Amendment freedoms and the broad powers of a grand jury, we must be careful to protect the interests underlying each.

We are not without helpful precedents. In *Branzburg*,[18] *supra*, the Supreme Court held that reporters could be required to appear and testify before a state or federal grand jury without violating freedom of speech and press guarantees. Justice White detailed the interests that required balancing and came to the following carefully qualified conclusion:

> On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to *relevant questions put to them in the course of a valid grand jury investigation or criminal trial.*[19]

408 U.S. at 690–91, 92 S.Ct. at 2661, 33 L.Ed.2d at 645 (emphasis added).

Even more pertinent, however, is the Court's basis for refusing to establish a constitutional news reporter's privilege on the recognized principle that the infringement of rights protected by the First Amendment must be no broader than necessary to achieve a permissible governmental objective.[20] The case before us falls squarely within the following hypothetical fact patterns *not* found present in *Branzburg* and which plainly would have produced a different result:

---

**18.** *Branzburg* was heard with two other cases, *In re Pappas* and *United States v. Caldwell*.

**19.** The relevancy qualification appears throughout the opinion, see 408 U.S. at 682, 685, 691, 697, 698, 708, 92 S.Ct. at 2657, 2658, 2661, 2664, 2665, 2670, 33 L.Ed.2d at 640, 642, 645, 648, 649, 655.

**20.** The Court cited *Freedman v. Maryland*, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649; *NAACP v. Alabama, supra*; *Martin v. City of Struthers*, 1943, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; *Elfbrandt v. Russell*, 1966, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321.

Nothing in the record indicates that these grand juries were "prob[ing] at will and without relation to existing need." *DeGregory v. Attorney General of New Hampshire*, 383 U.S. 825, 829 [, 86 S.Ct. 1148, 16 L.Ed.2d 292] (1966). Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether crime has been committed, cf. *NAACP v. Alabama*, 357 U.S. 449 [, 78 S.Ct. 1163, 2 L.Ed.2d 1488] (1958); *NAACP v. Button*, 371 U.S. 415 [, 83 S.Ct. 328, 9 L.Ed.2d 405] (1963); *Bates v. Little Rock*, 361 U.S. 516 [, 80 S.Ct. 412, 4 L.Ed.2d 480] (1960), and the characteristic secrecy of grand jury proceedings is a further protection against the undue invasion of such rights.

408 U.S. at 700, 92 S.Ct. at 2666, 33 L.Ed.2d at 650.

Finally, we construe the following language to constitute an assurance by the Court that the First Amendment is not banished from the grand jury room: [21]

Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose

wholly different issues for resolution under the First Amendment.[42] Official

[42] Cf. *Younger v. Harris*, 401 U.S. 37, 49, 53–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

408 U.S. at 707–08, 92 S.Ct. at 2670, 33 L.Ed.2d at 655.

We therefore conclude that the First Amendment can serve as a limitation on the power of the grand jury to interfere with a witness' freedoms of association and expression.[22] And that limitation is defined in terms of relevancy to the crime under investigation. When the grand jury goes on a fishing expedition in forbidden waters, the courts are not powerless to act.

*Bursey v. United States*, 9 Cir., 1972, 466 F.2d 1059,[23] involved an appeal by two staff members of The Black Panther newspaper. The appellants had been held in contempt for refusing to answer on First and Fifth Amendment grounds certain questions pro-

**21.** We are further assured by the concurring opinion of Justice Powell, 408 U.S. at 709–10, 92 S.Ct. at 2671, 33 L.Ed.2d at 656, and the dissent of Justice Stewart, who was joined by Justices Brennan and Marshall, 408 U.S. at 725–52, 92 S.Ct. at 2671–86, 33 L.Ed.2d at 665–82.

**22.** In the past this Court has displayed sensitivity to those whose rights have been violated by grand juries. *United States v. Briggs*, 5 Cir., 1975, 514 F.2d 794, involved a petition by persons named as unindicted conspirators for an order to expunge their names from federal indictments. Most of those so named had been active in Vietnam Veterans Against the War. The District Court denied relief. This Court vacated and remanded on due process grounds, with instructions to expunge from the indictments all references to the unindicted appellants. *In so doing, Judge Godbold stated:*

Visiting opprobrium on persons by officially charging them with crimes while denying them a forum to vindicate their names, undertaken as extra-judicial punishment *or to*

*chill their expressions and associations*, is not a governmental interest that we can accept or consider. It would circumvent the adversary process which is at the heart of our criminal justice system and of the relation between government and citizen under our constitutional system. It would be intolerable to our society.

*Id.* at 806 (footnote omitted; emphasis added). Cf. *In re Grand Jury Investigation*, 5 Cir., 1977, 565 F.2d 318, 320–21 (in absence of assertion of harassment or prosecutorial misuse of system, court will not impose preliminary procedures which would impede grand jury's investigative powers); *United States v. Brumley*, 5 Cir., 1977, 560 F.2d 1268, 1274 & n.3 (questioning jurisdiction of grand jury); *In re Grand Jury Proceedings*, 5 Cir., 1973, 479 F.2d 458 (portions of federal grand jury report ordered expunged because they related to state matters).

**23.** Rehearing and rehearing en banc requested, *inter alia*, in light of *Branzburg, supra*, was denied, 466 F.2d 1090.

pounded to them by a federal grand jury investigating Panther threats against the President's life. In its First Amendment analysis, the Court divided the unanswered questions into four categories, placed the burden on the government to establish that its interests were sufficiently legitimate and compelling to override First Amendment rights,[24] and held that the government sustained that burden only with regard to questions in the first category.[25] Of particular significance here is the Court's statements concerning the fourth category (source of party funding):

> To require a member of an association, especially a dissident political party, to reveal the details of its funding is as effective a chilling device as is compulsory disclosure of its membership lists. . . .
> A response to these questions may have produced some evidence substantially connected to the compelling objects of the investigation, but it may also have produced a quantity of information that was none of the grand jury's business.

**24.** This case differs from *Bursey* in the sense that it is too late to require Mississippi officials to meet this burden. The grand jury had been discharged when the present suit was filed.

**25.** The categories included questions regarding (i) the identity of the Black Panther Central Committee members and contacts between Panthers and foreign governments, 466 F.2d at 1086–87; (ii) the publication and distribution of the Panther's newspaper and pamphlets, *id.* at 1087–88; (iii) the identity of persons pictured in a national magazine; and (iv) the source of funds, *id.* at 1088.

**26.** Indeed, a protest march was scheduled and held on the first day the witnesses were subpoenaed to testify. Tr. at 139–40.

**27.** District Attorney Littlejohn testified at the preliminary hearing as follows:

Q  Defendant Littlejohn, I would like to direct your attention to Exhibit 1 [the leaflet]. Are you familiar with that document?
A  (Examined) Quite familiar.
Q  Would you state, sir, when you learned of its publication or when you learned of it being published?
A  On the afternoon of September 6th, 1974.
Q  And, sir, how did you learn that that had been published?
A  This was delivered to me by the Sheriff, or a Deputy Sheriff of Marshall County, who had come with Judge Brown to receive the final report of the Grand Jury in Lafayette County.

When First Amendment interests are at stake, the Government must use a scalpel, not an ax. There was no justification for these questions, and the witnesses cannot be compelled to answer them.

*Id.* at 1088.

With these legal principles in mind, we now turn to the facts before us. A black youth had been killed in Byhalia and no one was charged with his death. The United League—precisely the kind of organization whose members' rights must be protected by the First Amendment if the Bill of Rights is to mean anything—organized an economic boycott of the community which was enjoined by a state court until this Court intervened.[26] A pamphlet critical of District Attorney Littlejohn and the law enforcement and grand jury investigation had been circulated by the League. No one challenges the fact that it was the leaflet alone which inspired the resumption of the grand jury inquiry.[27]

. . . I was presented with a document, not identical to this but containing the same message on it. . . .
\*      \*      \*      \*      \*      \*
Q  Did he give you any reason, Mr. Littlejohn, why he brought that document to you?
A  I don't recall offhand whether he or Judge Brown gave me the document. They came together, and of course they were concerned with the allegations contained in it, as I was.
Q  Did you and Judge Brown have a subsequent conversation about that particular document?
A  Yes, we did, at that time.
Q  Would you state what the nature of that discussion was?
A  The Judge mentioned this to me, and informed me that he would call this Grand Jury back into session to investigate these allegations if I so requested it. Having never been accused of anything like this in several years as District Attorney, it concerned me greatly. I was deeply disturbed, because it cast reflections on my integrity as District Attorney. \*  \*  Because of that concern I immediately requested the Circuit Judge to call this Grand Jury back into session to see what information anybody had about the unfortunate death of Butler Young, Jr., with which I had been vitally concerned, and still am.
Tr. at 202–04.

■ We have no doubt that the leaflet circulated by the United League is "speech" protected by the First Amendment. *Cf. New York Times Co. v. Sullivan,* 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. Nor do we doubt that District Attorney Littlejohn and Judge Brown had not only the authority but the affirmative duty to bring before the grand jury any relevant information bearing on the Butler Young death. Moreover, we do not question the grand jury's authority to inquire as to any facts within the witness' knowledge which supported the accusations in the leaflet about the performance or non-performance of duties by governmental officials. We hold, however, that the grand jury had no right to intrude into United League matters having not the remotest relationship to that tragic event and its investigation.

■ At the injunction hearing before the District Court, various League officers and members testified that the grand jury inquired into the internal, structural, financial, and associational aspects of the League. While the percentage of time which, according to the witnesses, had been spent on questions relating to the League varied,[28] a fair characterization of the consensus was that such percentages were substantial. Our *in camera* review of the grand jury proceedings persuades us that, for the most part, their time estimate testimony is borne out by the record and demonstrates positively that the grand jury invaded areas protected by the First Amendment. The District Court's findings to the contrary [29] are no impediment to our conclusion, whether treated as clearly erroneous,[30] mixed questions of fact and law,[31] or reviewed under the broader standard sometimes employed when First Amendment freedoms are at stake.[32]

■ It would be a sorry day were we to allow a grand jury to delve into the membership, meetings, minutes, organizational structure, funding and political activities of unpopular organizations on the pretext that their members might have some information relevant to a crime. This is especially so here. League business was pursued in questioning in many instances after the witnesses had disavowed any knowledge of

**28.** Caldwell, Executive Secretary: 70% of the time was focused on the United League, Tr. at 120–21; Robinson, President: about one minute out of 20 or 25 minutes spent discussing the Butler Young case; rest spent on questions about organization, Tr. at 64; Boyd, Secretary: about half the time spent on United League; other half spent on why witness thought Littlejohn had not done a good job, Tr. at 98; Moore, Board Member: two questions relating to Young incident; others related to League organization, leaflet and accusations made therein, Tr. at 82–84; Smith, member: 90% of time spent on the League, Tr. at 128–29; Mrs. Anthony, Secretary, Byhalia branch: two questions about Young death; rest about League, Tr. at 110.

**29.** See note 11, *supra.*

**30.** Under Rule 52(a) F.R.Civ.P., a trial court's findings of fact are clearly erroneous when "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766; *George W. B. Bryson & Co. v. Norton Lilly & Co.,* 5 Cir., 1974, 502 F.2d 1045, 1049; *Tulia*

*Feedlot, Inc. v. United States,* 5 Cir., 513 F.2d 800, 807, *cert. denied,* 1975, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281.

**31.** In mixed question cases, the District Court's findings of fact are to be upheld unless clearly erroneous, Rule 52(a), F.R.Civ.P.; its conclusions of law are not restricted to this review. See *Buchanan v. United States Postal Service,* 5 Cir., 1975, 508 F.2d 259, 267 n.24. To the extent that the District Court's finding that there was "no impingement," of a constitutional right, is a fact determination, it is subject to the clearly erroneous standard. But the conclusion that there was no "impingement" wraps up the whole balancing problem whether the admitted or undisputed acts were of a nature to undermine, reject, or frustrate First Amendment values and is certainly a legal question. The District Court held that the plaintiffs had no right worthy of First Amendment protection. That conclusion of law was reached applying an incorrect legal standard.

**32.** *E. g., Cox v. Louisiana,* 1965, 379 U.S. 536, 545 & n.8, 85 S.Ct. 453, 13 L.Ed.2d 471; *Time, Inc. v. Pape,* 1971, 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45.

facts relative to Butler Young's death [33] and in some of those same instances after the witness additionally disavowed any knowledge of the origin or authorization of the leaflet. We also have confirmed that certain witnesses were questioned about League affairs despite protests or queries as to their relevancy.[34]

■ Under these circumstances, we fail to see, for example, how the subject of League finances was of any legitimate concern to the grand jury.[35] Absent a plausible explanation—and we find the record barren of one—we are forced to conclude that the questions directed to League witnesses about purely League business having no arguable or colorable relationship to the Young death were posed in bad faith for the purpose of harassing those who, in the exercise of their First Amendment rights, had criticized defendant Littlejohn and had called the grand jury proceeding a farce.

33. Defendant Littlejohn's own testimony at the injunction hearing confirmed the witnesses' ignorance of facts concerning the Butler Young incident:

Q Do you also recall, Mr. Littlejohn, that every single witness that came before the Grand Jury has told you that they had no personal knowledge of the circumstances surrounding the death of Butler Young, Jr.; do you recall that?
A I would again have to stand by the transcript in that, but my memory is that none of those connected with this League of Marshall County had one iota of fact upon which to base these assertions contained in [the leaflet of] Exhibit 1, right here (exhibiting documents); either the names of witnesses who had personal knowledge of it or that they had personal knowledge of it.
Tr. at 217.

34. See Tr. at 145–46.

35. In light of our review of the grand jury proceedings, we find Littlejohn's asserted justification for this line of inquiry to be insubstantial:

Q Sir, throughout the course of your interrogation of the various witnesses before the Grand Jury, during that term, do you recall asking any questions about the financial status of the United League of Marshall County?
A Some questions along that line were asked by me and by some members of the Grand Jury.

This abuse of the grand jury process cannot be tolerated in a free society.

■ In order to preserve the secrecy of the grand jury proceedings here, we decline to detail the offending questions. Suffice it to say that questions falling within these broad categories abridged the plaintiffs-appellants' associational and free speech rights:

(i) Questions relating to the membership of the United League of Marshall County.

(ii) Questions relating to those who associate with the United League.

(iii) Questions relating to United League meetings in general, persons who attend such meetings, and the matters discussed at such meetings.

(iv) Questions relating to League financing and funding generally or financing or funding of the leaflet.

(v) Questions relating to the leaflet or any other printed or oral statement of any League member.

Q Would you state what the reasons were for inquiring into the financial status of the political association?
A I simply wanted to know who was financing this kind of assertion against me, unless they knew what was going on, and the facts about it. And it was only when they had stated they had no knowledge of it that we were trying to get additional information.
Q You stated you only wanted to know who was financing the organization. Why, sir, was it important to find out who was financing the organization?
* * * * * *
A Anybody connected with this United League of Marshall County (exhibiting document), I wanted to know if they had any information that would assist me as District Attorney of the State of Mississippi, in the prosecution of this case, if we could find any additional information for indictments. That is what I was trying to find out, and I couldn't unless I knew who was involved in it.
Q Perhaps you misapprehended my question, Mr. Littlejohn. I asked you what was the relevance of any information regarding the financial status of the United League of Marshall County; what was the connection between that and the death of Butler Young, Jr.?
A The same connection of this leaflet right here (exhibiting document) being distributed with the information about his death.
Tr. at 213–15.

(vi) Questions relating to the economic boycott and protests organized by the United League.

## IV. "Equitable Restraint," Starring The Younger Sextet, and Featuring Progeny

As previously noted, the District Court, partially relying on *Younger v. Harris*, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, denied injunctive relief. The *Younger* Sextet [36] established that, absent extraordinary circumstances,[37] principles of equity, comity, and federalism barred federal courts from enjoining pending state criminal prosecutions. *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 applied like requirements to requests for declaratory relief. However, the Supreme Court reserved for another day the question whether the rule applied in the declaratory judgment context where no state prosecution was pending. *Samuels v. Mackell*, 401 U.S. at 73–74, 91 S.Ct. at 768, 27 L.Ed.2d at 694.[38]

In 1974, the Court answered that question negatively in *Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505, 516:

> [T]he relevant principles of equity, comity, and federalism "have little force in the absence of a pending state proceeding." *Lake Carriers' Assn. v. MacMullan*, 406 U.S. 498, 509 [, 92 S.Ct. 1749, 32 L.Ed.2d 257] (1972). When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding. Cf. *Dombrowski v. Pfister*, 380 U.S. 479, 490 [, 85 S.Ct. 1116, 14 L.Ed.2d 22] (1965).

However, the Court once again did not reach the question whether *Younger* principles applied where a party sought to enjoin future prosecutions. 415 U.S. at 463 & n.12, 94 S.Ct. at 1217–18 & n.12, 39 L.Ed.2d at 517 & n.12.

A partial answer has been provided by cases decided after *Steffel*.[39] In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648, two co-plaintiffs who had not been subject to criminal prosecution sought both declaratory and injunctive relief against the enforcement of a Hempstead, New York ordinance. The Court held that the issuance of a preliminary injunction was not barred by the doctrine of equitable restraint:

---

**36.** The other members of the sextet were *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; *Dyson v. Stein*, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; and *Byrne v. Karalexis*, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792.

**37.** *Younger* severely restricted but left intact *Dombrowski v. Pfister*, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, which established the permissibility of federal court intervention in state criminal prosecutions instituted in bad faith or for the purpose of harassment. 401 U.S. at 47–49, 54, 91 S.Ct. at 752–53, 755, 27 L.Ed.2d at 677–78, 681. *See also* Development.

ments in the Law—Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1323 (1977).

**38.** In their concurring opinion in *Younger*, Justices Stewart and Harlan made clear that the Court's decision dealt only with injunctions against prosecutions which were contemporaneously pending in state courts and not with future criminal prosecutions. 401 U.S. at 54–55, 91 S.Ct. at 757, 27 L.Ed.2d at 681–82.

**39.** The District Court issued its Memorandum Opinion on November 11, 1974 and thus did not have the benefit of these later pronouncements. However, *Steffel* had been decided over seven months earlier on March 19, 1974.

No state proceedings were pending against either Salem or Tim-Rob at the time the District Court issued its preliminary injunction. Nor was there any question that they satisfied the requirements for federal jurisdiction. As we have already stated, they were assuredly entitled to declaratory relief, and since we have previously recognized that "[o]rdinarily . . . the practical effect of [injunctive and declaratory] relief will be virtually identical," *Samuels*, 401 U.S., at 73 [, 91 S.Ct. 764], we think that Salem and Tim-Rob were entitled to have their claims for preliminary injunctive relief considered without regard to *Younger*'s restrictions.

422 U.S. at 930–31, 95 S.Ct. at 2567, 45 L.Ed.2d at 659.

*Wooley v. Maynard*, 1977, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752, provides further support for the proposition that *Younger* principles are not automatically triggered when injunctive relief against future prosecutions is sought. In that case, one of the plaintiffs had thrice been found guilty of and served the sentence imposed for violating a New Hampshire statute forbidding the knowing obstruction of figures or letters on a license plate. Mr. and Mrs. Maynard, both Jehovah's Witnesses, claimed that the New Hampshire requirement that license plates carry the state slogan, "Live Free or Die," was violative of their First Amendment rights. They sought both declaratory and injunctive relief against future enforcement of the statute against them. *Younger* was held not to preclude federal injunctive relief:

> It is correct that generally a court will not "enjoin the enforcement of a criminal statute even though unconstitutional." *Spielman Motor Co. v. Dodge*, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322 (1935),

since "[s]uch a result seriously impairs the state's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger*," *Doran*, supra, 422 U.S. at 931, 95 S.Ct. 2561, 45 L.Ed.2d 648. But this is not an absolute policy and in some circumstances injunctive relief may be appropriate. "To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." *Spielman Motor Co.*, supra, 295 U.S. at 95, 55 S.Ct. 678, 79 L.Ed. 1322.

430 U.S. at 711–12, 97 S.Ct. at 1434, 51 L.Ed.2d at 760–61.[40]

*Steffel, Doran* and *Maynard* suggest that when there will be no interruption of ongoing state criminal proceedings, and thus no threat to proper federal-state relations, *Younger* does not bar federal intervention so long as the plaintiff can satisfy the requirements of federal jurisdiction, and can demonstrate (i) exceptional circumstances and (ii) that an injunction is necessary for adequate protection of constitutional rights. These cases and others[41] further suggest that a blind and uncritical application of *Younger* would be both unwarranted and unwise when the policies underlying the equitable restraint doctrine are not disserved.

This Circuit has not in the past treated prayers for injunctive relief against state courts and officers as shibboleths to close the federal courthouse doors. *Stewart v. Dameron*, 5 Cir., 1971, 448 F.2d 396 and 5 Cir., 1972, 460 F.2d 278; *Shaw v. Garrison*, 5 Cir., 1972, 467 F.2d 113; *Milner v. Burson*, 5 Cir., 1972, 470 F.2d 870; *Morgan v. Wofford*, 5 Cir., 1973, 472 F.2d 822; *Jones v. Wade*, 5 Cir., 1973, 479 F.2d 1176, *prior opinion reaffirmed in light of Steffel v.*

---

**40.** This Court has recently stated that "even in its quasi-criminal extensions, *Younger* dismissal is called for *only* in those circumstances where successful defense of a state enforcement proceeding, initiated before substantial federal proceedings on the merits had occurred, would fully vindicate the federal plaintiff's federal right." *Morial v. Judiciary Commission*, 5

Cir., 1977, 565 F.2d 295, 299 (en banc) emphasis added.

**41.** *Fuentes v. Shevin*, 1971, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; *Allee v. Medrano*, 1974, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566; *Gerstein v. Pugh*, 1975, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54.

*Thompson*, 5 Cir., 1974, 504 F.2d 428; *Pugh v. Rainwater*, 5 Cir., 1973, 483 F.2d 778, *rev'd in part on other grounds sub nom. Gerstein v. Pugh*, 1975, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54; *Leonard v. City of Columbus*, 5 Cir., 1977, 551 F.2d 974, *aff'd en banc*, 1978, 565 F.2d 957. We decline to do so now.

First, there was no state prosecution pending against these plaintiffs when they instituted the present suit, thus making the *Younger* holding inapplicable. And, as far as we are aware, none has been brought since which would trigger *Hicks v. Miranda*, 1975, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223. No one is attempting to interrupt *any* ongoing state criminal proceeding or to enjoin the enforcement of or declare invalid any Mississippi statute. *E. g., Boyle v. Landry*, note 36, *supra.* The grand jury investigating the *Butler Young* case has concluded its business and has been discharged. Furthermore, there are no ongoing state-initiated civil proceedings "in aid of and closely related to criminal statutes," and no relief from enforcement of a state court judgment is being sought, *Huffman v. Pursue, Ltd.*, 1975, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482, 492. No state appellate proceedings are in progress. *Gibson v. Berryhill*, 1973, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488. Nor are there pending any privately instituted civil contempt proceed-ings, *Juidice v. Vail*, 1977, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376, 384, in which the state's contempt process is involved.[42]

We have before us a situation which falls into the hazy, undecided interstices of *Younger* and Progeny and defies analysis in strict or traditional *Younger* terms.[43] There is on file with the state court the transcript of a grand jury hearing, portions of which were extracted in bad faith doing violence to the plaintiffs' First Amendment rights. That transcript, by order of Judge Brown, a defendant-appellee here, can be made available to any state or federal officer or any subsequent grand jury. Significantly, that order does not limit availability to such state and federal officers or grand juries investigating the Butler Young incident, and we are sure Judge Brown could have imposed that limitation had he chosen to do so.[44]

Moreover, the report of the grand jury stands as part of its recorded proceedings. That report in effect "accuses, but furnishes no forum for a denial," [45] and suggests, through its direction that the grand jury proceedings be made available to the State Tax Commission,[46] that the witnesses who testified as to the financial and funding arrangements of the League in violation of their constitutional rights were suspected of some kind of wrongful conduct. This re-

---

**42.** See Developments in the Law—Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1310–11 (1977) [hereinafter cited as *Developments*]:

> The implications of the *Vail* decision are far from clear. While Justice Rehnquist held that *Younger* and *Huffman* "are not confined solely to the types of state actions which were sought to be enjoined in those cases," he explicitly eschewed full consideration of "the applicability of *Younger* to all civil litigation." Indeed, contempt proceedings of the type at issue in *Vail* form a poor basis for further generalizations and may in fact be sui generis.

**43.** See *Developments*, note 42, *supra*, at 1320.

**44.** Indeed, if it were limited in that fashion, an altogether different situation might have been presented.

**45.** *People v. McCabe*, 1933, 148 Misc. 330, 333, 266 N.Y.S. 363, 367, *quoted with approval in In re Davis*, 257 So.2d 884 (Miss.1972) and in *United States v. Briggs*, 5 Cir., 1975, 514 F.2d 794, 803.

**46.** We have wondered what could have prompted Judge Brown to make the grand jury transcript available upon application to *federal* officers unless the report's direction in this regard brought to his mind employees of the Internal Revenue Service. Judge Brown did not testify at the preliminary injunction hearing, and thus the record is silent on this score.

In today's life when income tax laws are the means by which notorious persons engaged in organized crime are frequently brought to book, the ominous threat, and thereby the motive, sharply reveals that the order had nothing to do with the unsolved homicide but rather the protests by these people against social and political conditions.

port has already been published in the press.[47]

■ The appellants did not have to resort to a Mississippi state court to redress this unconstitutional abuse of the grand jury process. *Monroe v. Pape, supra; Huffman v. Pursue, supra.*[48] Granting federal injunctive relief here would not reflect negatively on the ability of state courts to pass on constitutional issues, *Younger, supra,* nor jeopardize Mississippi's interest in the enforcement of its laws and smooth functioning of its judicial process, *e. g., Maynard, supra.* We are satisfied that exceptional circumstances and the necessity of federal relief have been amply demonstrated, *Maynard, supra.*

■ In sum, nothing in the *Younger* rules or the policies underlying them preclude injunctive relief here. *See Morial v. Judiciary Commission,* 5 Cir., 1977, 565 F.2d 295, 298–99; *Concerned Citizens of Vicksburg v. Sills,* 5 Cir., 1978, 567 F.2d 646, 650–651. There is certainly a live controversy between the parties so long as the grand jury report and transcript, replete with offending portions, remain open to inspection by federal or state officers and future grand juries. See generally *Developments,* note 42, at 1292–1300. And there is no assurance that retributive use will not be made of the transcript if an injunction does not issue in light of the entire history of this case.[49]

47. See note 4, *supra.* In this connection, the characteristic secrecy surrounding grand jury proceedings which normally protects witnesses, see quotation from *Branzburg* in text following note 20, afforded no protection to the plaintiffs-appellants with respect to the report.

48. There the Court stated:

By requiring exhaustion of state *appellate* remedies for the purposes of applying *Younger,* we in no way undermine *Monroe v. Pape,* 365 U.S. 167 [, 81 S.Ct. 473, 5 L.Ed.2d 492] (1961). There we held that one seeking redress under 42 U.S.C. § 1983 for a deprivation of federal rights need not first initiate state proceedings based on related state causes of action. 365 U.S. at 183 [, 81 S.Ct. 473]. *Monroe v. Pape* had nothing to do with that problem presently before us, that of the deference to be accorded state proceedings which have already been initiated and which afford a competent tribunal for the resolution of federal issues.

420 U.S. at 609–10 n. 21, 95 S.Ct. at 1211 (emphasis added).

49. George Caldwell, Executive Secretary of the United League, testified at the injunction hearing as follows:

Q Mr. Caldwell, what if any fear did you have because of your appearance before the Marshall County Grand Jury?

A Well, I was told by the District Attorney, not in the hearing room, but outside—I asked him why he was asking us all of these questions about the United League. And he told me, "You will know in due time". And we just decided we wouldn't circulate any more leaflets.

Tr. at 183. Defendant Littlejohn's testimony regarding his role in the formulation of the grand jury's suggested direction to turn the transcript over to the State Tax Commission

does not totally eliminate our concern over retributive use:

Q Sir, would you turn to the second page of that exhibit? I think it is the last page of that [grand jury] report.

A Yes, sir.

Q Do you see the part about turning information over to the State Tax Commission?

A Yes, I do.

Q Mr. Littlejohn, did you participate or partake in the development of that report?

A Yes, I did. This is the usual practice of the County Attorney, to write up in final form or have typed up in the final form the proceedings or the report of the grand jury. This is the usual and common practice.

Q So, it is safe to assume that the latter half of the report is reflective of your own thinking?

A This report speaks for the grand jury. I am not a member of that grand jury.

Q But you did state that you wrote the report form up, you and your colleague.

Well, I'm sorry. Mr. Moore is not a party defendant, he was recused. So, is it safe to assume that the report was written by you?

A This report was finally typed up by a secretary under my direction, at the conclusion of the grand jury proceedings. I left the grand jury room and left the entire matter to the grand jury, and asked them to prepare the report as to what they wanted included in it. They made that preparation in my absence. I asked them to knock on the door when they were through. They called me back in, I went back in and I took their report, and then this was typed up from that.

I would have to simply say that it is part of the wording, of course, of mine, as far as some of the wording contained in it. But these are the recommendations that came from that grand jury.

I did not tell them what to put in the report.

## V. To Enjoin Or Not To Enjoin

We recognize that a grant or denial of a preliminary injunction is discretionary and that the trial court can only be reversed for abuse of discretion. *E. g., Doran, supra,* 442 U.S. at 931–32, 95 S.Ct. at 2567, 45 L.Ed.2d at 659–60; *Buchanan v. United States Postal Service,* 5 Cir., 1975, 508 F.2d 259, 266. The District Court recited the *Canal Authority* requirements,[50] but, perhaps because it believed that no constitutional violation had occurred—thus making it unlikely that the plaintiffs would prevail on the merits—it held that the irreparable injury requirement had not been met.[51] Our previous discussion makes clear our belief in the certainty that plaintiffs will prevail on the merits of their constitutional claim and if an injunction does not issue that they will suffer further irreparable injury in living under the fear that at any time the authorities will pursue the objectives that set all this in motion.[52] As discussed earlier,[53] to the extent that the District Court considered exhaustion in terms of irreparable injury, we do not agree that exhaustion was required. While the District Court did not express its views on the third and fourth requirements, the burden of this opinion leaves little, if anything, open on remand as to these issues.

## VI. Denouement

Since the District Court did not have before it more recent Supreme Court pronouncements on the equitable restraint doctrine, we feel that a remand with specific instructions is unjustified. The District Court is now in a position to fashion a remedy that will best protect the plaintiffs and do the least violence to any legitimate interests the State of Mississippi might have in the event that it should reopen the Butler Young case for further investigation.

We therefore reverse and remand for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

JONES, Circuit Judge, dissenting:

There must be some way that this matter could have been handled in the courts of Mississippi. It should have been. The Federal Courts should have abstained.

---

* * * * * *
BY THE COURT:

Q  Was there any question about the finances of the organization being taxable or nontaxable?

A  Yes, sir, that question arose in the course of the questioning before the grand jury, Your Honor.

Q  And that was the action of the grand jury, with reference to that part of it?

A  Yes, sir.

Tr. at 260–63.

**50.** *Canal Authority v. Callaway,* 5 Cir., 1974, 489 F.2d 567, 572:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

The four prerequisites for granting injunctive relief involve mixed questions of law and fact reviewable under the standard set forth in *Buchanan v. United States Postal Service,* 5 Cir., 1975, 508 F.2d 259, 267 n.24 (note 31, *supra* ).

**51.** See note 11, *supra.*

**52.** The testimony at the injunction hearing on the chilling effect of the grand jury proceedings stands unchallenged. *See, e. g.,* Tr. at 128–30, 145, 160–61, 183, 190.

**53.** See text at note 17 and note 13, *supra.*